[No. S020835. Dec. 31, 1992.]

THOMAS K. BUTT et al., Plaintiffs and Respondents, v.
THE STATE OF CALIFORNIA et al., Defendants and Appellants.

## COUNSEL

Daniel E. Lungren, Attorney General, Robert L. Mukai, Chief Assistant Attorney General, Charlton G. Holland, Assistant Attorney General, D. Robert Shuman, Richard J. Chivaro, Joseph R. Symkowick, Roger D. Wolfertz, Michael E. Hersher, Allan H. Keown and Stuart Biegel for Defendants and Appellants.

Frank R. Calton, Howard P. Abelson, Ronald A. Zumbrun and Anthony T. Caso as Amici Curiae on behalf of Defendants and Appellants.

Eva Paterson, Michael Harris, Morrison & Foerster, Darryl Rains, Arturo J. Gonzalez and Katherine E. Schuelke for Plaintiffs and Respondents.

Beverly Tucker, A. Eugene Huguenin, Jr., Robert Einar Lindquist, Constance de la Vega, Ann Fagan Ginger, Linda Fullerton, Alan L. Schlosser, Edward M. Chen, Matthew A. Coles, Margaret C. Crosby, Richard Briffault, John A. Powell, Helen Hershkoff, Adam S. Cohen, Winslow & Fassler, Martin Fassler, Bunch & Grimes and Michael C. Grimes as Amici Curiae on behalf of Plaintiffs and Respondents.

Robert J. Bezemek as Amicus Curiae.

## OPINION

**BAXTER. J.**—In late April 1991, after a period of mounting deficits, the Richmond Unified School District (District) announced it lacked funds to complete the final six weeks of its 1990-1991 school term. The District proposed to close its doors on May 1, 1991. The Superior Court of Contra Costa County issued a preliminary injunction directing the State of California (State), its Controller, and its Superintendent of Public Instruction (SPI) to ensure that the District's students would receive a full school term or its equivalent. The court approved the SPI's plan for an emergency State loan, and for appointment by the SPI of an administrator to take temporary charge of the District's operation.

We declined to stay implementation of the plan pending the State's appeal. However, we transferred the appeal here in order to decide an important issue of first impression: Whether the State has a constitutional duty, aside from the equal allocation of educational funds, to prevent the budgetary problems of a particular school district from depriving its students of "basic" educational equality.

We affirm the trial court's determination that such a duty exists under the California Constitution. Further, the court did not err in concluding, on the basis of the plaintiffs' preliminary showing, that the particular circumstances of this case demanded immediate State intervention. However, the court exceeded its judicial powers by approving the diversion of emergency loan funds from appropriations clearly intended by the Legislature for other purposes.

## FACTS AND PROCEDURAL HISTORY[1]

On April 17, 1991, Thomas K. Butt and other named District parents filed a class action for temporary and permanent injunctive relief against the State and the District's board of education (Board).[2] The complaint alleged as follows: The State is responsible for educating all California children, and the Board is the State's agent for carrying out this responsibility in the District. The scheduled final day of the District's 1990-1991 school term was June 14, 1991, but the District had announced that its 44 elementary, secondary, and adult schools would close on May 1, 1991. The resulting loss of six weeks of instruction would cause serious, irreparable harm to the District's 31,500 students and would deny them their "fundamental right to an effective public education" under the California Constitution. Moreover, as an unjustified discrimination against District students compared to those elsewhere in California, the closure would violate equal protection guarantees of the California and United States Constitutions. Therefore, defendants should be enjoined from closing the District's schools before the scheduled end of the scholastic term.

On April 22, 1991, plaintiffs noticed a motion for preliminary injunction. In an attached declaration, Frank R. Calton, a member of the Board, stated

---

[1] The State, as appellant, has elected to proceed by way of an appendix in lieu of the clerk's transcript, as permitted by rule 5.1 of the California Rules of Court. Some of the documents contained in the appendix, though they include handwritten filing dates, bear no official file stamps and have no proofs of service attached. However, rule 5.1 expressly allows the use of unofficial conformed copies (subd. (c)(1)) and provides that the filing of an appendix "constitutes a representation by counsel that the appendix consists of true and correct copies of the papers in the superior court file" (subd. (i)(1)). No party having urged otherwise, we adopt that assumption for purposes of this opinion.

[2] The named plaintiffs sued on behalf of themselves, their children, and other parents and students of the District.

that the District projected a revenue shortfall of $23 million for the 1990-1991 academic year and only had sufficient funds to pay its employees through April 1991. Calton declared the District would have to close at the end of April unless new funds were obtained or employees agreed to work for registered warrants in lieu of paychecks. He indicated that the District's efforts to obtain an emergency loan from the State had not yet succeeded, and the District was preparing to file for bankruptcy.

Plaintiffs' motion papers also included declarations by District teachers, academicians in the field of education, and members of the Contra Costa County board of education. These statements detailed the serious disruptive effect the proposed closure would have upon the educational process in the District and upon the quality of education afforded its students.

The motion was heard on April 29, 1991. The Attorney General represented the State in opposition. Counsel for the District represented that the Board's appearance was precluded by an automatic bankruptcy stay. The trial court granted plaintiffs' unopposed motion for amendment of the complaint to include the SPI and the Controller as defendants. Pending applications for intervention and amicus curiae status were not formally granted,[3] but as stipulated by the parties, the court heard argument from the applicants and agreed to consider their briefs.

At the conclusion of the hearing, the trial court ruled orally that under the California Constitution, the State itself is responsible for the "fundamental" educational rights of California students and must remedy a local district's inability to provide its students an education "basically equivalent" to that provided elsewhere in the State. Concluding that the threatened closure would deny the District's students a "constitutionally [equal] education," the court ordered the State and the SPI to act as "they deem appropriate" to ensure that District schools remained open until June 14, 1991, or to provide District students a "substantially equivalent educational opportunity" within the statutory school year ending June 30, 1991.

This oral decision was followed by two written orders filed May 2. One of these, drafted by plaintiffs' counsel, purported to formalize the April 29 ruling. It made findings that closure of District schools by May 1 would cause District students irreparable harm, that the balance of harm favored a preliminary injunction, that education is a "fundamental right" in California,

---

[3]Applications to appear as amici curiae were submitted by the Richmond Federation of Teachers (RFT) and jointly by the Meiklejohn Civil Liberties Institute, the National Lawyers Guild, and Multi-Cultural Education, Training, and Advocacy, Inc. (collectively Meiklejohn). Complaints in intervention and/or applications for leave to intervene were submitted by the Oakland Unified School District (OUSD), RFT, and United Teachers of Richmond (UTR).

that no "compelling interest" justified denying District students six weeks of instruction available to "every other child in the State," and that plaintiffs' ultimate success on the merits was reasonably probable. The State and its agents again were directed to act "as . . . appropriate" to ensure District students, within the school year ending June 30, 1991, an education "equivalent basically" to that provided elsewhere in California for a full school term. The Controller was added as a State official expressly bound by the court's commands.

On the same day, May 2, the SPI and the Controller submitted their plan for compliance with the preliminary injunction. With counsel for all interested parties present, the court took evidence indicating that uncommitted funds exceeding the estimated $19 million necessary to complete the District's school year were available from existing State appropriations to the Greater Avenues for Independence (GAIN) program and for emergency assistance to the OUSD. Counsel for the OUSD stipulated that his client had "no objection" to use of the $10 million OUSD appropriation for purposes of an emergency loan to the District.

Accordingly, the court executed an order, drafted by counsel for the SPI, approving in principle the submitted plan.[4] The order authorized the Controller to disburse an emergency loan to the District from unspent portions of the GAIN and OUSD appropriations. (See Stats. 1989, ch. 93, § 22.00; Stats. 1989, ch. 1438, § 1 et seq.) Meanwhile, the SPI, by virtue of the State's "ultimate responsibility" for equal education and his own statutory obligation to "superintend the schools of this state" (Ed. Code, § 33112, subd. (a)),[5] would have authority to "relieve the . . . [B]oard of its legal duties and powers, appoint a trustee, develop a recovery plan and, subject to the approval of the Controller, [develop] a repayment plan on the [D]istrict's behalf as necessary" to ensure completion of the school term, the District's financial recovery, and the protection of the loaned funds.[6]

The Attorney General timely noticed appeals from the April 29 and May 2 orders on behalf of the State. Defendants SPI and Controller did not

---

[4]Though the court's order recites that the SPI and the Controller "presented . . . , after notice to all parties, an agreement" to provide an emergency loan, neither the agreement itself, nor a description of its precise terms, has been made part of the record on appeal.

[5]All further statutory references are to the Education Code unless otherwise indicated.

[6]The preliminary injunction motion was litigated with understandable haste, and evidence of the causes of the District's apparent insolvency was not presented below. On appeal, the SPI invites us to take judicial notice of grand jury findings on this subject which were released after the preliminary injunction was granted. (See The Financial Affairs of the Richmond Unified School District, Rep. of 1990-1991 Contra Costa County Grand Jury (May 29, 1991) [hereafter Report].) Without objection, we may note the Report's contents. (Evid. Code, §§ 452, subds. (c), (d), 455, 459; see *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1259, fn. 54 [275 Cal.Rptr. 729, 800 P.2d 1159].) Of course, we cannot accept its findings as evidence or its criticisms of the District and the Board as conclusively founded. We are

appeal. The State immediately requested transfer of the appeal from the Court of Appeal, First Appellate District, to this court (see Cal. Rules of Court, rule 20) and also asked that we stay enforcement of the trial court's orders pending appeal. The SPI and the Controller opposed a stay but supported transfer of the appeal to this court. We granted the transfer request but denied a stay.[7]

## DISCUSSION

### 1. *Standard of review.*

 In deciding whether to issue a preliminary injunction, a court must weigh two "interrelated" factors: (1) the likelihood that the moving party

particularly loath to do so when the District and the Board were disabled below from defending against claims of mismanagement and, except for a special appearance at oral argument, have not participated in the appeal.

Nonetheless, we cannot ignore the grand jury's assessment that despite repeated warnings, an earnest but financially inexperienced Board permitted massive, accelerating deficit spending over a period of several years to expand staff, boost salaries and benefits, and support innovative programs installed by the District's former superintendent. (Report, pp. 3-5.) According to the Report, the resulting deficit for the years 1986-1990 was $29.5 million, with an $18.1 million deficit for 1990 alone. (*Id.*, at p. 4.) In 1990, the District had received a State emergency loan exceeding $9 million, in consequence of which a limited-powers trustee appointed by the SPI was overseeing District financial affairs during the 1990-1991 school term. (*Id.*, at p. 5.)

[7]Our denial of a stay allowed implementation of the plan approved by the trial court, and the District's school year was completed. Though the State vigorously contends the court lacked power to invade the GAIN and OUSD appropriations, it does not demand actual rescission of the court-approved loan. Moreover, we judicially notice without objection that in June 1992, the SPI approved a repayment and recovery plan adopted by the District, restored the Board's powers, and terminated the court-authorized appointment of the State administrator. (See Evid. Code, §§ 452, subds. (c), (h), 455, 459.) Although portions of the appeal may therefore be technically moot, we have discretion to decide the issues presented as potentially recurring questions of public importance. (E.g., *O'Hare* v. *Superior Court* (1987) 43 Cal.3d 86, 91, fn. 1 [233 Cal.Rptr. 332, 729 P.2d 766]; *DiGiorgio Fruit Corp.* v. *Dept. of Employment* (1961) 56 Cal.2d 54, 58 [13 Cal.Rptr. 663, 362 P.2d 487]; *People* v. *West Coast Shows, Inc.* (1970) 10 Cal.App.3d 462, 468 [89 Cal.Rptr. 290].)

The Chief Justice objects in particular that we neither must nor should address whether the sources of funding approved by the trial court were proper. However, he fails to indicate why this important and sensitive issue is any more moot, or any less worthy of consideration, than other portions of the trial court's order which have also been irretrievably implemented. Indeed, in these uncertain times, the substantial possibility arises that similar future crises will produce similar emergency orders for immediate diversion of State funds from expedient sources. Hence, contrary to the Chief Justice's suggestion, the issue is one capable of repetition but difficult to review, and this concern favors its prompt consideration under the "public interest" exception to the mootness doctrine. (*DiGiorgio Fruit Corp., supra,* 56 Cal.2d at p. 58.) Moreover, the State has fully litigated the merits of the appropriations issue throughout, and any mootness in this or other aspects of the injunction stems from our denial of the State's request for a stay pending appeal. Under these circumstances, the State should not be penalized on appeal for conceding that State funds already expended by the District cannot practicably be recovered.

will ultimately prevail on the merits and (2) the relative interim harm to the parties from issuance or nonissuance of the injunction. (*Common Cause* v. *Board of Supervisors* (1989) 49 Cal.3d 432, 441-442 [261 Cal.Rptr. 574, 777 P.2d 610].) Appellate review is limited to whether the trial court's decision was an abuse of discretion. (*Cohen* v. *Board of Supervisors* (1985) 40 Cal.3d 277, 286 [219 Cal.Rptr. 467, 707 P.2d 840].)

The trial court's determination must be guided by a "mix" of the potential-merit and interim-harm factors; the greater the plaintiff's showing on one, the less must be shown on the other to support an injunction. (*King* v. *Meese* (1987) 43 Cal.3d 1217, 1227-1228 [240 Cal.Rptr. 829, 743 P.2d 889].) Of course, "[t]he scope of available preliminary relief is necessarily limited by the scope of the relief likely to be obtained at trial on the merits." (*Common Cause, supra*, 49 Cal.3d at p. 442.) A trial court may not grant a preliminary injunction, regardless of the balance of interim harm, unless there is some possibility that the plaintiff would ultimately prevail on the merits of the claim. (*Id.*, at pp. 442-443.) Unless potential merit is conceded, an appellate court must therefore address that issue when reviewing an order granting a preliminary injunction.

Here, the trial court found that plaintiffs' constitutional demand for State intervention had potential merit, and that the balance of interim harm justified the issuance of a preliminary injunction against the State. For the reasons that follow, we conclude that each of these determinations was within the court's discretion.[8]

2. *Merits of plaintiffs' claims.*

 The trial court expressly found "[t]here is a reasonable probability that plaintiffs will succeed on the merits of their case." The court agreed with plaintiffs' claim that the equal protection guaranties of the California Constitution (art. I, § 7, subds. (a), (b); art. IV, § 16, subd. (a)) require State intervention to ensure that fiscal problems do not deprive a local district's

---

[8]The State insists that under the circumstances of this case, appellate review should not be limited to whether the trial court "abused its discretion" when weighing "interim" harm and "probable" merit. The State stresses that the unstayed injunction, though preliminary in form, was both final and unprecedented in fact. Accordingly, the State suggests, we must decide, as on appeal from a final judgment, whether plaintiffs were entitled to the relief they received.

We disagree. The abuse-of-discretion standard acknowledges that the propriety of preliminary relief turns upon difficult estimates and predictions from a record which is necessarily truncated and incomplete. Here, the urgency of the situation forced plaintiffs to produce, and the State to rebut, a hasty tentative showing of constitutional necessity. The evidence on which the trial court was forced to act may thus be significantly different from that which would be available after a trial on the merits. Neither the trial court nor this court could undertake a final adjudication of plaintiffs' lawsuit under such circumstances.

students of basic educational equality.[9] The court also accepted plaintiffs' preliminary showing that the effect of the District's crisis on its students' educational rights was serious enough to trigger the State's constitutional duty. The State, supported by amicus curiae Pacific Legal Foundation (Pacific),[10] assails these conclusions on multiple grounds.

At the outset, the State does not claim it lacks any and all constitutional role in local educational affairs. Instead, its reasoning proceeds as follows: The State fulfills its financial responsibility for educational equality by subjecting all local districts, rich and poor, to an equalized statewide revenue base.[11] Unless a district fails to provide the minimum six-month school term set forth in the "free school" clause (Cal. Const., art. IX, § 5),[12] the State has no duty to ensure prudent use of the equalized funds by local administrators. Even if local mismanagement causes one district's services to fall seriously below prevailing statewide standards, the resulting educational inequality is

[9]Article I, section 7, subdivision (a) provides in pertinent part that "[a] person may not be . . . denied equal protection of the laws. . . ." Article I, section 7, subdivision (b) provides in pertinent part that "[a] citizen or class of citizens may not be granted privileges or immunities not granted on the same terms to all citizens. . . ." Article IV, section 16, subdivision (a) provides that "[a]ll laws of a general nature have uniform operation."

[10]The positions adopted by the various parties and numerous amici curiae in this appeal are diverse. The Attorney General, representing the State as defendant and appellant, opposes all aspects of the trial court orders. Though they were joined as defendants below, the SPI and the Controller, deeming themselves "respondents" on appeal, support plaintiffs' view that the orders were proper in all respects. Amicus curiae Pacific supports the State's position. Amici curiae RFT and UTR approve State financial aid but object to displacement of the local governing board by a State administrator. Amici curiae Frank R. Calton and Howard P. Abelson urge that the Board acted correctly by deciding to close District schools and should not have been displaced. Calton and Abelson also suggest the injunction was improper because the Board had no opportunity to appear and defend against claims of mismanagement. Amici curiae Mario Diaz and Rebecca Hazlewood Bezemek (Diaz and Bezemek) take no position on State financial assistance but argue that the SPI's takeover of District government was improper. Amicus curiae briefs in support of plaintiffs have been filed by the American Civil Liberties Union Foundation, Human Rights Advocates, and Meiklejohn.

[11]The funding scheme for public education is complex, but no party disputes the summary description provided in the State's brief: "The Legislature has attempted to equalize school district funding . . . by the use of a 'base revenue limit' for each district. Each district is classified by size and type. ([Ed.] Code, [§] 42238.) Based upon this classification scheme, each district has a 'base revenue limit' per unit of average daily attendance. The base revenue limit for any district includes the amount of property tax revenues a district can raise, with other specific local revenues, coupled with an equalization payment by the State, thus bringing each district into a rough equivalency of revenues. (Compare [Cal. Code Regs., tit. 5, [§] 15371, *et seq.*[; Ed.] Code [§] 42238 et seq.) [¶] Because the student population is so diverse, the Legislature had to supplement the base revenue limit with specific augmentations targeted for categories of children with needs that require special attention. These supplements are designated as 'categorical' aid. . . ."

[12]Article IX, section 5 provides: "The Legislature shall provide for a system of common schools by which a free school shall be kept up and supported in each district at least six months in every year, after the first year in which a school has been established."

not grounded in district wealth, nor does it involve a "suspect classification" such as race. Thus, "strict scrutiny" of the disparity is not required, and the State's refusal to intervene must be upheld as rationally related to its policy of local control and accountability. Even if strict scrutiny is appropriate, the local-control policy is "compelling" enough to justify the State's inaction.

Under the unprecedented circumstances of this case, we cannot accept the State's contentions. We set forth our reasons in detail.

Since its admission to the Union, California has assumed specific responsibility for a statewide public education system open on equal terms to all. The Constitution of 1849 directed the Legislature to "provide for a system of common schools, by which a school shall be kept up and supported in each district . . . ." (Cal. Const. of 1849, art. IX, § 3.) That constitutional command, with the additional proviso that the school maintained by each district be "free," has persisted to the present day. (Cal. Const., art. IX, § 5.)

In furtherance of the State system of free public education, the Constitution also creates State and county educational offices, including a Superintendent of Public Instruction and a State Board of Education. (Cal. Const., art. IX, §§ 2-3.3, 7.) It authorizes the formation of local school districts (id., §§ 6½, 14), requires that all public elementary and secondary schools be administered within the Public School System (id., § 6), establishes a State School Fund (Fund) (id., § 4), reserves a minimum portion of State revenues for allocation to the Fund (id., art. XVI, §§ 8, 8.5), guarantees minimum allocations from the Fund for each public school (id., art. IX, § 6), specifies minimum salaries for public school teachers (ibid.), authorizes the State Board of Education to approve public school textbooks (id., § 7.5), and permits the Legislature to grant local districts such authority over their affairs as does not "conflict with the laws and purposes for which school districts are established" (id., § 14).

Accordingly, California courts have adhered to the following principles: Public education is an obligation which the State assumed by the adoption of the Constitution. (San Francisco Unified School Dist. v. Johnson (1971) 3 Cal.3d 937, 951-952 [92 Cal.Rptr. 309, 479 P.2d 669]; Piper v. Big Pine School Dist. (1924) 193 Cal. 664, 669 [226 P. 926].) The system of public schools, although administered through local districts created by the Legislature, is "one system . . . applicable to all the common schools . . . ." (Kennedy v. Miller (1893) 97 Cal. 429, 432 [32 P. 558], italics in original.) ". . . In view of the importance of education to society and to the individual child, the opportunity to receive the schooling furnished by the state must be made available to all on an equal basis. . . ." (Jackson v.

*Pasadena City School Dist.* (1963) 59 Cal.2d 876, 880 [31 Cal.Rptr. 606, 382 P.2d 878].) "[M]anagement and control of the public schools [is] a matter of state[, not local,] care and supervision. . . ." (*Kennedy* v. *Miller, supra,* 97 Cal. at p. 431; see also *Hall* v. *City of Taft* (1956) 47 Cal.2d 177, 181 [302 P.2d 574]; *California Teachers Assn.* v. *Huff* (1992) 5 Cal.App.4th 1513, 1523-1524 [7 Cal.Rptr.2d 699].) The Legislature's "plenary" power over public education is subject only to constitutional restrictions. (*Hall* v. *City of Taft, supra,* at pp. 180-181 [302 P.2d 574]; *Tinsley* v. *Palo Alto Unified School Dist.* (1979) 91 Cal.App.3d 871, 903-904 [154 Cal.Rptr. 591].) Local districts are the State's agents for local operation of the common school system (*Hall* v. *City of Taft, supra,* at p. 181; *San Francisco Unified School Dist.* v. *Johnson, supra,* 3 Cal.3d at p. 952; *California Teachers Assn., supra*), and the State's ultimate responsibility for public education cannot be delegated to any other entity (*Hall* v. *City of Taft, supra; Piper* v. *Big Pine School Dist., supra,* 193 Cal. at p. 669).

It is true that the Legislature has assigned much of the governance of the public schools to the local districts (e.g., §§ 14000, 35160 et seq., 35160.1), which operate under officials who are locally elected and appointed (§§ 35020, 35100 et seq.). The districts are separate political entities for some purposes. (E.g., *Johnson* v. *San Diego Unified School Dist.* (1990) 217 Cal.App.3d 692, 698-700 [266 Cal.Rptr. 187] [general theory of respondeat superior does not make State liable for torts of local district or its employees]; *Gonzales* v. *State of California* (1972) 29 Cal.App.3d 585, 590-592 [105 Cal.Rptr. 804] [same]; *First Interstate Bank* v. *State of California* (1987) 197 Cal.App.3d 627, 633-634 [243 Cal.Rptr. 8] [State not vicariously liable for district's breach of contract]; *Board of Education* v. *Calderon* (1973) 35 Cal.App.3d 490, 496 [110 Cal.Rptr. 916] [local district is not the "state" or the "People," so as to be civilly bound in dismissal proceedings by teacher's acquittal of criminal sex offense under principles of res judicata].)

Yet the existence of this local-district system has not prevented recognition that the State itself has broad responsibility to ensure basic educational equality under the California Constitution. Because access to a public education is a uniquely fundamental personal interest in California, our courts have consistently found that the State charter accords broader rights against State-maintained educational discrimination than does federal law. Despite contrary federal authority, California constitutional principles require State assistance to correct basic "interdistrict" disparities in the system of common schools, even when the discriminatory effect was not produced by the purposeful conduct of the State or its agents.

In *Serrano* v. *Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187] (*Serrano I*), this court struck down the existing State

public school financing scheme, which caused the amount of basic revenues per pupil to vary substantially among the respective districts depending on their taxable property values. *Serrano I* concluded at length that such a scheme violated both state and federal equal protection guaranties because it discriminated against a fundamental interest—education—on the basis of a suspect classification—district wealth—and could not be justified by a compelling state interest under the strict scrutiny test thus applicable. (Pp. 596-619.) As the court concluded, "where fundamental rights *or* suspect classifications are at stake, a state's general freedom to discriminate on a geographical basis will be significantly curtailed by the equal protection clause. [Citation.]" (P. 612, italics added.)

Among other things, *Serrano I* rejected a claim that the wealth-based financing scheme was immune from challenge because the interdistrict revenue disparities it produced were not de jure, but merely de facto. Our opinion detailed the purposeful state legislative action which had produced the geographically based wealth classifications. It also made clear, however, that under California principles developed in cases involving school racial segregation, the absence of purposeful conduct by the State would not prevent a finding that the State system for funding public education had produced unconstitutional results. (*Serrano I, supra*, 5 Cal.3d at pp. 603-604, citing *Jackson* v. *Pasadena City School Dist., supra*, 59 Cal.2d 876, 881.)

*Serrano I* also discussed two groups of federal cases suggesting that place of residence was an impermissible basis for State discrimination in the quality of education. *Serrano I* cited with approval *Hall* v. *St. Helena Parish School Board* (E.D.La. 1961) 197 F.Supp. 649. This federal decision struck down a Louisiana statute permitting local parishes to close their schools rather than integrate them. As *Serrano I* noted, *Hall* v. *St. Helena Parish* found an equal protection violation not only because of the statute's racial consequences, but also " 'because its application in one parish, while the state provides public schools elsewhere, would unfairly discriminate against the residents of that parish, irrespective of race. . . . [A]bsent a reasonable basis for so classifying, a state cannot close the public schools in one area while, at the same time, it maintains schools elsewhere with public funds.' " (*Serrano I, supra*, 5 Cal.3d at p. 612, quoting *Hall* v. *St. Helena Parish, supra*, 197 F. Supp. at pp. 651, 656.)

*Serrano I* further noted a "second group of cases, dealing with apportionment [of votes], [in which] the high court has held that accidents of geography and arbitrary boundary lines of local government can afford no ground for discrimination among a state's citizens. [Citation.] . . . If a voter's address may not determine the weight to which his ballot is entitled,

surely it should not determine the quality of his child's education. [Fn.]" (*Serrano I, supra*, 5 Cal.3d at p. 613.)

Finally, *Serrano I* rejected the State's claim that plaintiffs' wealth-discrimination theory would apply equally, and with disastrous effect, to all public services dependent in part on local property taxes. "[W]e are satisfied," the majority concluded, that whatever the status of other public services, "its uniqueness among public activities clearly demonstrates that *education* must respond to the command of the equal protection clause." (*Serrano I, supra*, 5 Cal.3d at p. 614, italics in original.)

In *San Antonio School District* v. *Rodriguez* (1973) 411 U.S. 1 [36 L.Ed.2d 16, 93 S.Ct. 1278], decided after *Serrano I*, the United States Supreme Court declined to subject Texas's similar local-property-tax based school financing scheme to heightened scrutiny under the Fourteenth Amendment. The *Rodriguez* majority concluded that a school finance scheme dependent on district tax values does not discriminate against the poor as a distinct class; in any event, the majority observed, wealth alone had never been deemed a suspect classification for federal purposes. Moreover, the majority reasoned, education is not a fundamental interest protected by the federal Constitution. Therefore finding the strict scrutiny standard of review inapplicable, the majority upheld Texas's system as rationally related to that state's policy of local control of schools. (411 U.S. at pp. 18-55.)

Nonetheless, in *Serrano* v. *Priest* (1976) 18 Cal.3d 728 [135 Cal.Rptr. 345, 557 P.2d 929] (*Serrano II*), this court reaffirmed the reasoning and result of *Serrano I* as required by the separate equal protection guaranties of the California Constitution. (*Serrano II, supra*, 18 Cal.3d at pp. 760-768.) Among other things, *Serrano II* reiterated that for California purposes, education remains a fundamental interest "which [lies] at the core of our free and representative form of government [fn.] . . . ." (*Id.*, at pp. 767-768.)

Hence, *Serrano II* declared, "[i]n applying our state constitutional provisions guaranteeing equal protection of the laws we shall continue to apply strict and searching judicial scrutiny" to claims of discriminatory educational classifications. (*Serrano II, supra*, at p. 767.) More recent cases confirm that education is a fundamental interest under the California equal protection guaranties (e.g., *Steffes* v. *California Interscholastic Federation* (1986) 176 Cal.App.3d 739, 746 [222 Cal.Rptr. 355]) and that the unique importance of public education in California's constitutional scheme requires careful scrutiny of state interference with basic educational rights (see, e.g., *Hartzell* v. *Connell* (1984) 35 Cal.3d 899, 906-909 [201 Cal.Rptr. 601, 679 P.2d 35] [scope of free school guarantee]).

In *Tinsley* v. *Palo Alto Unified School Dist.*, *supra*, 91 Cal.App.3d 871, parents sought mandate requiring several neighboring San Mateo and Santa Clara County school districts, the State, and certain State school officials, to submit a plan for the redress of interdistrict racial segregation in the affected locality. The petitioners declined to allege any specific acts committed by State or local parties as the cause of the interdistrict imbalance.

The State respondents answered the petition, but the districts successfully demurred, and the petition was dismissed as to them. The Court of Appeal reversed, holding that the California Constitution, unlike its federal counterpart as construed in *Milliken* v. *Bradley* (1974) 418 U.S. 717 [41 L.Ed.2d 1069, 94 S.Ct. 3112], contemplates interdistrict relief to remedy mere de facto racial imbalance which extends across district lines. (*Tinsley*, *supra*, 91 Cal.App.3d at pp. 899-907.) Several aspects of the *Tinsley* decision emphasize the State's ultimate responsibility for maintaining a nondiscriminatory common school system.

At the outset, the districts asserted that an appeal was premature under the "one final judgment" rule, because as mere agencies of the State, which had not demurred, they had no separate legal interests which an appeal from their dismissal could finally resolve. The Court of Appeal observed that if the districts' claim of mere agency was correct, any relief ordered against the State would necessarily affect them, and the judgment dismissing them from the action should therefore be reversed. In any event, the court concluded, the premise of identical interests did not bear scrutiny, because while "[t]he local districts, as agents, may have limited powers in interdistrict affairs, . . . the state . . . has plenary powers in all school district affairs. . . ." (*Tinsley*, *supra*, 91 Cal.App.3d at pp. 880-881.)

Turning to the merits, *Tinsley* dismissed the majority reasoning in *Milliken* insofar as based on the federal rule, long rejected in California (see *Crawford* v. *Board of Education* (1976) 17 Cal.3d 280 [130 Cal.Rptr. 724, 551 P.2d 28]; *Jackson* v. *Pasadena City School Dist.*, *supra*, 59 Cal.2d 876), that only de jure racial segregation is a constitutional violation. (*Tinsley*, *supra*, 91 Cal.App.3d at p. 903.) *Tinsley* also distinguished the *Milliken* majority's concern that it "would disrupt and alter" Michigan's entrenched system of local control of schools to impose an interdistrict remedy for Detroit city school segregation without proof that the state or affected suburban districts had engaged in intentional segregative conduct. The *Tinsley* court noted, among other things, that in California, the State shares responsibility with "the local entities it has created" to provide "equal educational opportunity

to the youth of the state" and "has a duty to intervene to prevent unconstitutional discrimination" in its schools. (*Id.*, at pp. 903-904.)[13]

It therefore appears well settled that the California Constitution makes public education uniquely a fundamental concern of the State and prohibits maintenance and operation of the common public school system in a way which denies basic educational equality to the students of particular districts. The State itself bears the ultimate authority and responsibility to ensure that its district-based system of common schools provides basic equality of educational opportunity.

The State claims it need only ensure the six-month minimum term guaranteed by the free school clause (Cal. Const., art. IX, § 5). This contention, however, misconstrues the basis of the trial court's decision. Whatever the requirements of the free school guaranty, the equal protection clause precludes the State from maintaining its common school system in a manner that denies the students of one district an education basically equivalent to that provided elsewhere throughout the State.

The State argues that even if the District's fiscal problems threatened its students' basic educational equality, any State duty to redress the discrimination must be judged under the most lenient standard of equal protection review. The State reasons as follows: Plaintiffs do not claim discrimination on the suspect basis of race. Nor is wealth-based discrimination at issue; as all parties concede, the District received the full benefit of the equalized funding system mandated by our *Serrano* decisions. At most, plaintiffs assert that a misuse of equalized funds by the District's officials caused a geographical disparity in service. Because residence and geography are not suspect classifications, the State's failure to prevent educational discrimination on those grounds is not subject to strict scrutiny. Rather, State inaction must be accepted as rationally related to the legitimate State policy of local control of schools.

■ However, both federal and California decisions make clear that heightened scrutiny applies to State-maintained discrimination whenever the

---

[13]In November 1979, the voters adopted a Senate amendment to the California Constitution's equal protection clause, article I, section 7, subdivision (a). The amendment declares that nothing in the California Constitution imposes upon the State, or any local district or official, any obligations beyond those imposed by the Fourteenth Amendment of the United States Constitution "with respect to the use of pupil school assignment or pupil transportation." The amendment further forbids California courts from imposing any school-assignment or pupil-transportation obligation except when a violation of the Fourteenth Amendment has occurred, and unless a federal court could impose such a remedy for the violation. Whatever effect this amendment may have on *Tinsley*'s result, it does not affect consistent interpretations of the California equal protection guaranty where, as here, assignment or transportation of students is not at issue.

disfavored class is suspect *or* the disparate treatment has a real and appreciable impact on a fundamental right or interest. (*Plyler* v. *Doe* (1982) 457 U.S. 202, 216-217 [72 L.Ed.2d 786, 102 S.Ct. 2382]; *Shapiro* v. *Thompson* (1969) 394 U.S. 618, 634 [22 L.Ed.2d 600, 614-615, 89 S.Ct. 1322]; *Darces* v. *Woods* (1984) 35 Cal.3d 871, 885, 888 [201 Cal.Rptr. 807, 679 P.2d 458]; *Fair Political Practices Com.* v. *Superior Court* (1979) 25 Cal.3d 33, 47 [157 Cal.Rptr. 855, 599 P.2d 46]; *Serrano II, supra,* 18 Cal.3d 728, 761, 767-768; *Weber* v. *City Council* (1973) 9 Cal.3d 950, 959 [109 Cal.Rptr. 553, 513 P.2d 601]; *Serrano I, supra,* 5 Cal.3d 584, 597; *Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 784-785 [87 Cal.Rptr. 839, 471 P.2d 487].) As we have seen, education is such a fundamental interest for purposes of equal protection analysis under the California Constitution.

▇▇▇ The State suggests there was no showing that the impact of the threatened closure on District students' fundamental right to basic educational equality was real and appreciable. Of course, the Constitution does not prohibit all disparities in educational quality or service. Despite extensive State regulation and standardization (see discussion, *post*), the experience offered by our vast and diverse public school system undoubtedly differs to a considerable degree among districts, schools, and individual students. These distinctions arise from inevitable variances in local programs, philosophies, and conditions. "[A] requirement that [the State] provide [strictly] 'equal' educational opportunities would thus seem to present an entirely unworkable standard requiring impossible measurements and comparisons. . . ." (*Hendrick Hudson Dist. Bd. of Ed.* v. *Rowley* (1982) 458 U.S. 176, 198 [73 L.Ed.2d 690, 707, 102 S.Ct. 3034].) Moreover, principles of equal protection have never required the State to remedy all ills or eliminate all variances in service.

Accordingly, the California Constitution does not guarantee uniformity of term length for its own sake. While the current statutory system for allocating State educational funds strongly encourages a term of at least 175 days (see fn. 14, *post*, at p. 687), that system is not constitutionally based and is subject to change. In an uncertain future, local districts, faced with mounting fiscal pressures, may be forced to seek creative ways to gain maximum educational benefit from limited resources. In such circumstances, a planned reduction of overall term length might be compensated by other means, such as extended daily hours, more intensive lesson plans, summer sessions, volunteer programs, and the like. An individual district's efforts in this regard are entitled to considerable deference.

Even unplanned truncation of the intended school term will not necessarily constitute a denial of "basic" educational equality. A finding of constitutional disparity depends on the individual facts. Unless the actual quality

of the district's program, viewed as a whole, falls fundamentally below prevailing statewide standards, no constitutional violation occurs.

Here, however, plaintiffs' preliminary showing suggested that closure of the District's schools on May 1, 1991, would cause an extreme and unprecedented disparity in educational service and progress. District students faced the sudden loss of the final six weeks, or almost one-fifth, of the standard school term originally intended by the District and provided everywhere else in California.[14] The record indicates that the decision to close early was a desperate, unplanned response to the District's impending insolvency and the impasse in negotiations for further emergency State aid.[15] Several District teachers declared that they were operating on standard-term lesson schedules made at the beginning of the school year. These declarants outlined in detail how the proposed early closure would prevent them from completing instruction and grading essential for academic promotion, high school graduation, and college entrance.[16] Faced with evidence of such extensive educational disruption, the trial court did not abuse its discretion

---

[14]The trial court record contains no evidence of the prevailing term length in California, but the parties assumed below that a minimum term of 175 days prevails, and no dispute has arisen on the issue here. The statutes provide that an established local district may not receive any part of its annual apportionment from the State School Fund if it failed to remain in session at least 175 days during the most recent fiscal year, unless specified circumstances excusing the failure are established to the satisfaction of the SPI. (§§ 41420, subd. (a), 41422.) In an appendix to his brief, the SPI provides copies of local district certifications, submitted to the SPI as a condition of funding under section 41420, which indicate that virtually every established school district in California operated for at least 175 days during the 1990-1991 school year. The SPI asks us to take judicial notice of this information. Having received no objection, we do so. (Evid. Code, §§ 452, subds. (c), (h), 455, 459.)

[15]The declaration of Board member Calton, dated April 12, 1991, detailed the District's growing financial woes and stated the following: ". . . The District has only enough money to pay its employees through April 1991 [even under the most favorable accounting assumptions]. . . . Unless (a) additional funds are received, or (b) employees are willing to work for registered warrants, not redeemable checks, the District will have no alternative but to close all of its public schools at the end of April 1991. [¶] . . . The District has applied to the State of California for a loan, but that request has not been approved. It is my understanding that [collective bargaining concessions demanded by the State] have not been made, although negotiations are continuing. The District has retained bankruptcy counsel, . . . and is preparing to file for bankruptcy prior to April 30, 1991, if necessary."

[16]For example, John Enos, a high school government/economics teacher, stated that early termination of his required senior government class would eliminate intended lessons covering the State's executive and judicial branches, and county and local government. Geoffrey Cantrell, a high school mathematics teacher, stated that if the District closed early, Algebra I students would miss essential instruction in quadratic equations; Algebra II students would miss essential instruction in trigonometry; and geometry students would miss lessons in coordinate systems, logical proof, and trigonometric ratios. Craig Brammer, another high school mathematics teacher who also teaches a preparatory course for the Scholastic Aptitude Test (SAT), opined that loss of six weeks' instruction would severely impair his students' chances on the mathematics portion of the SAT. Betty Jean Crenshaw, a teacher of first-year languages, declared that early closure would prevent students from learning vocabulary and

by concluding that the proposed closure would have a real and appreciable impact on the affected students' fundamental California right to basic educational equality.

The State asserts that its financial obligation to equal education is limited to the equalized system of interdistrict funding required by our *Serrano* decisions. Once revenues are fairly apportioned at the beginning of each school year, the State insists, it cannot be constitutionally liable for how local officials manage the funds.

Nothing in the *Serrano* cases themselves, or in other California decisions, supports the State's argument. On the contrary, the cases suggest that the State's responsibility for basic equality in its system of common schools extends beyond the detached role of fair funder or fair legislator. In extreme circumstances at least, the State "has a duty to intervene to prevent unconstitutional discrimination" at the local level. (*Tinsley, supra,* 91 Cal.App.3d at p. 904.)

The State's most vigorous contention is that its nonintervention should have been upheld even under the strict scrutiny standard of equal protection analysis. Allowing the District's students to absorb the consequences of District mismanagement, the State urges, was necessary to preserve the State's compelling educational policy of local autonomy and accountability. However, the State fails to demonstrate a policy of local control so compelling as to justify State tolerance of the extreme local educational deprivation at issue here.

In the first place, the local-district system of school administration, though recognized by the Constitution and deeply rooted in tradition, is not a constitutional mandate, but a legislative choice. (See Cal. Const., art. IX, §§ 6½, 14.) The Constitution has always vested "plenary" power over education not in the districts, but in the State, through its Legislature, which may create, dissolve, combine, modify, and regulate local districts at pleasure. (See *Tinsley, supra,* 91 Cal.App.3d at p. 904.) The legislative decision

---

grammar necessary for advancement to second-year courses. Amy Shinsako, a first grade teacher, stated that early closure would prevent instruction in phonics, reading comprehension, creative writing, handwriting skills, two-digit addition and subtraction, and addition with three addends, all necessary for advancement to the second grade. Several declarants noted that failure to complete the term would prevent the scheduling of final examinations and other term-end projects crucial to the assignment of final grades. Other declarants detailed the difficulties District students would face if forced to transfer to other districts to complete the year's studies. They also noted that unless graduating seniors completed required courses and received final grades, the District might not be able to award high school diplomas, any diplomas awarded would be "stigmatized," and the ability of departing seniors to qualify for college admission might be seriously compromised.

to emphasize local administration does not end the State's constitutional responsibility for basic equality in the operation of its common school system. Nor does disagreement with the fiscal practices of a local district outweigh the rights of its blameless students to basic educational equality.

Moreover, though the Constitution and statutes encourage maximum local program and spending authority consistent with State law (Cal. Const., art. IX, § 14; Ed. Code, §§ 14000, 35160, 35160.1), the degree of supervision voluntarily retained by the State over the common school system is high indeed. The volume and scope of State regulation indicate the pervasive role the State itself has chosen to assume in order to ensure a fair, high quality public education for all California students.

School finance aside, the statutes address at length such matters as county and district organization, elections, and governance (§§ 4000-5450, 35000-35780); educational programs, instructional materials, and proficiency testing (§§ 51000-62008); sex discrimination and affirmative action (§§ 40-41, 200-263, 44100-44105); admission standards (§§ 48000-48053); compulsory attendance (§§ 48200-48416); school facilities (§§ 39000-40048); rights and responsibilities of students and parents (§§ 48900-49079); holidays (§§ 37220-37223); school health, safety, and nutrition (§§ 32000-32254, 49300-49570); teacher credentialing and certification (§§ 44200-44481); rights and duties of public school employees (§§ 44000-44104, 44800-45460; see also Gov. Code §§ 3540-3549.3 [organizational and bargaining rights]); and the pension system for public school teachers (§§ 22000-24924). The statutory scheme has spawned further voluminous regulations administered by the State's Department of Education and the SPI. (Cal. Code Regs., tit. 5, §§ 1-23005.) This long-established level of State involvement in the public education system undermines any claim that local control is a paramount and compelling State policy for all purposes.

Nor is there any indication that the State has had a compelling policy of absolute budgetary freedom and responsibility for local districts. On the contrary, during the years in which the District's deficit developed, districts were required to adopt budgets meeting State standards, and to submit them for oversight and approval by county and State authorities. (§§ 33127, former §§ 42120-42129.) Failure to adopt a conforming budget precluded State or county funding of the district (former § 42128), and a district was required to operate under its most recent approved budget (former § 42127.4).

The State argues that by saddling the District with long-term debt to cover short-term operations, the trial court's orders undermine the District's future

financial health and compromise its ability to provide basic educational equivalency in years to come. The State also urges that other districts will feel free to overspend if encouraged to believe in the availability of State relief.

These are indeed troubling concerns, but we cannot accept the implication that the State deems them compelling. In fact, the State itself has endorsed a policy of emergency conditional loan assistance to districts in financial difficulty.

Under statutes in effect since 1977, distressed districts may, through the SPI, seek specific legislative apportionments for emergency loans. (§§ 41310, 41310.5, 41320 et seq.) As a condition of such aid, a district must prepare a financial recovery plan and obtain approval of the plan from the county superintendent and the SPI. (§ 41320.) The district must also accept a temporary SPI-appointed trustee with veto power over financially significant actions of the local governing board. (§ 41320.1.)

The District itself had received a $9,525,000 conditional State loan under this program in spring 1990 (Stats. 1990, ch. 171, § 3), and its operations were already being monitored by a State trustee at the time closure of District schools was threatened in April 1991. The 1989 Legislature had also appropriated $10 million for a similar emergency loan-with-trustee to the OUSD. (Stats. 1989, ch. 1438, §§ 1-11.) Under these circumstances, the State cannot claim it follows a compelling policy of local control by declining to intervene when financial adversity threatens a district's operations.

Shortly before this lawsuit began, the District faced the prospect of further legislative intervention in its crisis. Assembly Bill No. 128, 1991-1992 Regular Session (A.B. 128), as introduced in December 1990 and thereafter amended, would have appropriated an additional $29 million for emergency loans to the District. Acceptance of the proposed loan would have subjected the District to unprecedented restrictions on self-government. These included a temporary takeover of all District affairs by an SPI-appointed administrator pending approval and implementation of a plan for financial recovery and loan repayment. The administrator would have had broad power, among others, to unilaterally determine wages and benefits for all District employees who, as of April 29, 1991, were not covered by ratified collective bargaining agreements meeting the requirements of an approved recovery plan. (A.B. 128, Sen. Amend. of Jan. 18, 1991, §§ 2, 5.)

A.B. 128 failed passage, but that fact does not suggest a compelling policy against emergency State financial assistance to a local district. On the

contrary, the State has forged into the realm of emergency assistance and control, using the "specific appropriation" requirement (§ 41320) to decide on a case-by-case basis whether, and on what terms, it will intervene.

The State claims that emergency assistance to mismanaged districts contravenes the compelling principle of equalized funding established in our *Serrano* decisions. As we have seen, however, nothing in the *Serrano* cases, which addressed wealth-based disparities in district revenues, prohibits emergency State assistance to a particular district which is experiencing financial difficulties despite its receipt of equalized funding.[17]

Finally, nothing in our analysis is intended to immunize local school officials from accountability for mismanagement, or to suggest that they may indulge in fiscal irresponsibility without penalty. The State is constitutionally free to legislate against any recurrence of the Richmond crisis. It may further tighten budgetary oversight, impose prudent, nondiscriminatory conditions on emergency State aid, and authorize intervention by State education officials to stabilize the management of local districts whose imprudent policies have threatened their fiscal integrity. To the extent such conditions compromise local autonomy and mortgage a district's future, they are not calculated to persuade local officials or their constituents that mismanagement and profligacy will be rewarded.

Indeed, in response to this case, the Legislature and the Governor have already agreed to tighter county and State control of local district budgets and spending.[18] Under certain circumstances, this new legislation *requires* the SPI's complete takeover of an insolvent district as a precondition of an

---

[17]The *Serrano* decisions themselves, as well as the subsequent adoption of Proposition 13, have exacerbated the need for occasional emergency State intervention by restricting one aspect of local control—the power of local districts to tax themselves out of financial crises. Our *Serrano* opinions condemned the former dependence of school finance on local ad valorem property taxes, because, as a practical matter, however willing a local district might be to increase taxes for education, "districts with small [real property] tax bases simply cannot levy taxes at a rate sufficient to produce the revenue that more affluent districts reap with minimal tax efforts. . . ." (*Serrano I, supra*, 5 Cal.3d 584, 598.) In obedience to *Serrano* principles, the current system of public school finance largely eliminates the ability of local districts, rich or poor, to increase local ad valorem property taxes to fund current operations at a level exceeding their State-equalized revenue per average daily attendance. (§ 42238 et seq.) Moreover, Proposition 13 places a general ceiling on the ad valorem property taxes which may be levied on behalf of local governments and school districts. (Cal. Const., art. XIII A, § 1.)

[18]Legislation adopted in 1991 provides, among other things, that if a local district's proposed budget fails to win final county and State approval, the county superintendent of schools shall adopt a governing budget for the district which permits the district to meet current and "multiyear" commitments. The county superintendent may rescind any district action or payment which is inconsistent with the county superintendent's budget, except those

emergency State appropriation.[19] Thus, the State has already made vast inroads on the principle that local control is paramount to State intervention in an insolvent district's affairs. The State's plenary power over education includes ample means to discourage future mismanagement in the day-to-day operations of local districts.

In sum, the California Constitution guarantees "basic" equality in public education, regardless of district residence. Because education is a fundamental interest in California, denials of basic educational equality on the basis of district residence are subject to strict scrutiny. The State is the entity with ultimate responsibility for equal operation of the common school system. Accordingly, the State is obliged to intervene when a local district's fiscal problems would otherwise deny its students basic educational equality, unless the State can demonstrate a compelling reason for failing to do so.

The preliminary facts before the trial court support the inference that the District's impending failure to complete the final six weeks of its scheduled school term would cause educational disruption sufficient to deprive District students of basic educational equality. The State has identified no compelling interest which negated its duty to intervene. We therefore find no abuse of discretion in the trial court's conclusion that plaintiffs' constitutional claims had potential merit.[20]

### 3. *Interim harm.*

The trial court also expressly concluded that plaintiffs, District students and their parents, would suffer "substantial and irreparable harm" if a preliminary injunction were denied. This harm, the court further found,

---

in performance of a previously effective collective bargaining agreement. (§ 42127.3, subd. (b)(1), as amended by Stats. 1991, ch. 1213, § 18.) The county superintendent must also monitor all local budgets continuously to ensure that each district can meet its financial obligations for the current and ensuing fiscal years. A county superintendent's determination that a district will be unable to meet its obligations triggers a process which may culminate in forced revisions to the district's budget and rescission of actions, other than collective bargaining obligations, which are inconsistent with the revisions. (§ 42127.6, added by Stats. 1991, ch. 1213, § 20.)

[19]New sections 41325 through 41327 provide that when a local district accepts an emergency appropriation more than twice the size of its State-recommended reserve, the SPI must take control of the district for at least two fiscal years, assume all duties and powers of the local governing board, fire district officials who took no action to avert insolvency, impose a recovery plan including a ten-year repayment schedule, and remain in control until satisfied that local compliance with recovery requirements is probable.

[20]Our conclusion that the trial court's finding of probable merit is supported by the equal protection clauses of the California Constitution makes it unnecessary to address claims that a State duty of intervention may also have arisen under the "free school" clause or the Fourteenth Amendment.

would be "greater . . . than defendants will suffer if the injunction is granted."

These determinations were based upon the uncontradicted declarations of District teachers, local and regional public school officials, and academic specialists in the field of public education. Besides detailing the severe and immediate academic disruption which would arise from the pending closure (see discussion, *ante*, fn. 16, at p. 687), these declarations set forth at length the "ripple" effect on District parents and students. For example, the declarations recounted, working parents, including the high percentage of needy families in the District, would be faced with expensive child care for the lost school hours; difficult efforts would be required to obtain other placement of the students for the remainder of the year; and special-need students would lose carefully nurtured progress.

The State submitted no evidence that it would suffer comparable or greater harm by offering emergency loan assistance necessary to ensure completion of the District's academic program for 1990-1991. Instead, the State simply argued that court-ordered State aid would damage the State's public school policies of local control and accountability.

The State nonetheless claims plaintiffs' "interim harm" showing was inadequate as a matter of law. In the State's view, plaintiffs' declarations failed to establish that the early closure was unforeseeable, or to explain persuasively why any adverse effects on student progress could not be ameliorated.

We find the trial court's interim-harm findings amply supported. As previously noted, plaintiffs' preliminary showing suggested that the District's inability to complete its school year arose from its ever-worsening fiscal condition and from the deterioration of its negotiations for emergency aid. The declarations of District teachers uniformly indicated that their lesson plans did not provide for the contingency of early closure. Other declarations detailed the difficulties of alternate arrangements to maintain the educational progress of over 31,000 suddenly displaced District students, who included high school seniors poised for graduation. The court could reasonably infer that orderly planning to minimize the resulting educational disruption had not taken place and was not realistically possible.

In any event, the court was not obliged to deny a preliminary injunction simply because plaintiffs failed to demonstrate that "irreparable" harm to students was unavoidable by other means. The preliminary record properly convinced the court *both* that plaintiffs had a reasonable probability of

success on the merits, *and* that they would suffer more harm in the meantime if an injunction were denied than the State would suffer if it were granted. This "mix" of the "interrelated" relevant factors fully justified the court's decision to grant the injunction. (See *Common Cause* v. *Board of Supervisors, supra*, 49 Cal.3d at pp. 441-442; *King* v. *Meese, supra*, 43 Cal.3d at p. 1227.) No error appears.

### 4. *Scope of remedial order.*

In orders dated April 29, 1991, and May 2, 1991, the trial court directed the State, the SPI, and the Controller to ensure "by whatever means they deem appropriate" that District students would receive their educational rights; both orders made clear that "[h]ow these defendants accomplish this is up to the discretion of defendants. . . ." When no other State official proposed a solution, the SPI and the Controller, on May 2, 1991, offered a conditional loan plan for approval by the court.

After a hearing on that day, the court found that $19 million in aid funds proposed by the SPI and the Controller were presently available, and the court authorized the Controller to apportion such funds as an emergency loan to the District. The court further determined that, given the State's obligation to provide an equal education, the SPI's statutory authority to "[s]uperintend the schools of this state" (§ 33112, subd. (a)), and the "unique" emergency circumstances, "the [SPI] . . . has authority to relieve the [Board] of its legal duties and powers, appoint a trustee, develop a recovery plan and, subject to the approval of the Controller, [develop] a repayment plan on the [D]istrict's behalf as necessary to ensure the operation of the schools through June 14, 1991, the financial recovery of the [D]istrict, and the protection of State funds loaned to the [D]istrict."

The State and several amici curiae contend that even if the trial court could require State intervention to prevent violation of the District students' constitutional rights, there was no legal or equitable basis for the court's order authorizing the SPI to displace the Board, operate the District through his own administrator, and impose a plan for the District's permanent financial recovery. Under the circumstances presented by this case, however, we conclude that this portion of the court's order did not exceed its powers.

We agree that the statutes themselves provided no direct authority for the approach taken by the trial court. In general, though they act as regulated State agents, local governing boards are vested by statute with immediate jurisdiction over day-to-day district affairs. (§§ 14000, 35000 et seq.) The

SPI has important statutory responsibilities for allocating school funds (§§ 33118, 14000 et seq.), monitoring local budgets (§§ 42120 et seq., 41450), and administering the conditions of emergency loans *appropriated by the Legislature* (§§ 41310, 41320 et seq.; see also § 41325 et seq.), but no statute grants him emergency powers to operate a local district under other circumstances.[21]

The court relied in part on section 33112, subdivision (a), which provides that the SPI shall "[s]uperintend the schools of this state." But no case has interpreted this statute to vest the SPI with nonexpress powers, and an older decision construed similar language narrowly against a county superintendent. (*McKenzie* v. *Board of Education* (1905) 1 Cal.App. 406, 409 [82 P. 392].) Indeed, counsel for the SPI conceded in the trial court that the SPI had no statutory authority to take over the District's government.

The trial court also believed its takeover order was within its inherent equitable power to enforce the State's constitutional obligations in light of the "unique emergency financial conditions" presented by the case. In the court's view, ratification of all loan conditions proposed by the SPI was necessary to ensure the District's continued operation through June 14, 1991, promote its permanent financial recovery, and protect the loan itself. We agree.

■ In general, courts have equitable authority to enforce their constitutional judgments. (E.g., *Crawford* v. *Board of Education, supra,* 17 Cal.3d 280, 308.) Of course, principles of comity and separation of powers place significant restraints on courts' authority to order or ratify acts normally committed to the discretion of other branches or officials. (*Common Cause* v. *Board of Supervisors, supra,* 49 Cal.3d 432, 445-446; *Mandel* v. *Myers* (1981) 29 Cal.3d 531, 540 [174 Cal.Rptr. 841, 629 P.2d 935]; *Serrano II, supra,* 18 Cal.3d 728, 751; *Crawford* v. *Board of Education, supra,* 17 Cal.3d at pp. 305-306; cf. *Missouri* v. *Jenkins* (1990) 495 U.S. 33, 50-58 [109 L.Ed.2d 31, 53-59, 110 S.Ct. 1651].) In particular, the separation of powers doctrine (Cal. Const., art. III, § 3) obliges the judiciary to respect the separate constitutional roles of the Executive and the Legislature.

Moreover, a judicial remedy must be tailored to the harm at issue. (E.g., *Sheet Metal Workers* v. *EEOC* (1986) 478 U.S. 421, 476 [92 L.Ed.2d 344, 388, 106 S.Ct. 3019]; *Dayton Board of Education* v. *Brinkman* (1977) 433

---

[21]A.B. 128 would have granted the SPI powers of this magnitude over the District, but the bill failed passage. (See discussion, *ante,* at p. 690.) 1991 statutory amendments call for the SPI's takeover of districts that accept large emergency insolvency *appropriations* (§ 41325 et seq.; see discussion, *ante,* fn. 18 at p. 691), but even after 1991, the SPI has no such statutory authority *independent* of a specific insolvency appropriation by the Legislature.

U.S. 406, 420 [53 L.Ed.2d 851, 863-864, 97 S.Ct. 2766].) A court should always strive for the least disruptive remedy adequate to its legitimate task.

The trial court's remedial order in this case fell within proper boundaries. Having correctly held the State constitutionally responsible for the students' rights, the court could not deny the State and its officials effective means of fulfilling its obligation. Under the circumstances, the court was warranted in authorizing temporary transfer to the SPI of the Board's statutory powers over District affairs.

The emergency the court confronted on May 2, 1991, demanded a prompt State-assisted solution to prevent immediate closure of the District's schools. The State was justified in satisfying its constitutional duty of aid by extending a loan that would impose the ultimate consequences of the District's self-created predicament upon the District, rather than upon the State, its taxpayers, and the students of other districts. The State was also entitled to conditions on the loan that would ensure its appropriate use for the intended constitutional purpose, and would minimize the risk of the District's default in repayment.

The District's ability to administer the new loan under its existing systems and managers was uniquely suspect. As a matter of public record, the District's worsening financial situation had recently led the Legislature to provide a loan in excess of $9 million. A limited-powers State trustee appointed to monitor the District's fiscal affairs in connection with that loan had not been able to stem a growing District deficit estimated by one declarant, a member of the Board, to exceed $23 million for the 1990-1991 school year alone. In response to these difficulties, the Board had caused the District to seek bankruptcy protection against its existing creditors.

As counsel for the SPI explained on April 29, 1991, the District's unprecedented financial collapse indicated systemic management problems. Hence, counsel reported, the SPI considered it foolhardy to extend further substantial State credit to the District unless its management was placed in competent hands, its administrative practices were reformed and restructured from the outside, and a long-term plan for its financial recovery was imposed.[22] On behalf of the State, the Attorney General contested the legality of vesting such extraordinary powers in the SPI, but no party disputed the logic of the SPI's position.

---

[22]The following colloquy occurred between the court and counsel for the SPI: "[¶] MR. HERSHER [SPI's counsel]: . . . [The SPI] does not want to make . . . 20 to 30 million dollars in state funds available to a district that has already demonstrated substantial financial irresponsibility. It's pouring state money into a hole and it's never going to come back out. [¶] THE COURT: Would he want to do that if the State was given the responsibility for running the district as you suggested? [¶] MR. HERSHER: I believe so. I think what Bill Honig sees is that

Nor can we. Given the emergency circumstances, and under the extreme and aggravated conditions disclosed by the evidence, the court below could properly conclude that orderly completion of the District's 1990-1991 school term, and the sound financing essential to achieve that end, required temporary displacement of the sitting Board and the operation of the District by the SPI's designee for the purpose of stabilizing its financial affairs.[23] We conclude that the order approving temporary takeover of the District by the SPI was within the court's inherent equitable power to remedy the constitutional crisis.[24]

### 5. Source of loan funds.

In order to obtain the necessary $19 million in emergency loan funds, the trial court authorized the Controller to disburse (1) $9 million of unspent funds from a special contingency appropriation to the Department of Education for the GAIN program, and (2) the unused $10 million appropriated as an emergency loan to the OUSD. ■ The State and amicus curiae Pacific argue that because the Legislature had not earmarked either of these sums

---

the District has to be reorganized. The financial management of the District needs to be completely restructured, and there needs to be a long-term recovery plan . . . . [I]t has always been [the SPI's] position that somebody needs to . . . take over the District, come up with a long-term plan in which all the creditors of the District suffer equally or equitably."

[23] Amici curiae Diaz and Bezemek ask us to receive additional evidence and make findings about the SPI's record as administrator of the District after May 2, 1991. Among other things, Diaz and Bezemek allege that the SPI's administrator has withdrawn the District's bankruptcy petition, dismantled essential programs, failed to reappoint a citizens' advisory committee, restructured the District's administration, dismissed faculty and counselors, obstructed reorganization of the District's existing debt, imposed an unconscionable interest rate on the court-approved loan, and diverted educational funds to debt repayment. Diaz and Bezemek claim this evidence supports their contention that the SPI's governance of the District presents an inherent conflict between his role as protector of State-loaned funds and his duty to restore the District to financial and educational health.

Appellate courts have limited powers to take evidence and find facts in nonjury civil cases. (Cal. Const., art. VI, § 11; Code Civ. Proc., § 909; Cal. Rules of Court, rule 23(b).) However, the matters Diaz and Bezemek seek to present are beyond the scope of this lawsuit and unnecessary to our analysis. Moreover, Diaz and Bezemek concede the proffered evidence is disputed; appellate courts will not resolve such factual conflicts. (E.g., *In re Marriage of Davis* (1983) 141 Cal.App.3d 71, 75-76 [190 Cal.Rptr. 104]; see *McCracken v. Teets* (1953) 41 Cal.2d 648, 653 [262 P.2d 561].) We therefore deny the motion.

[24] The State argues that even if extraordinary judicial interference in the District's affairs was necessary to guarantee the constitutional rights of District students, the court erred by granting the SPI extralegal "discretion" to act rather than assuming control over the District itself, with the SPI as the court's appointed agent. The State cites no authority for its proposition that the court's remedial options were so narrowly confined. The remedial order of May 2, 1991, makes clear that the authority therein accorded the SPI flows from a direct and critical exercise of the court's equitable power and jurisdiction over the constitutional dispute. The order laudably minimizes direct judicial involvement in matters best left to officials with specific responsibilities and expertise in education, but its effect is no different than if it had expressly made the SPI a court functionary. We find no error.

for purposes "reasonably related" to resolving the District's financial crisis, the court improperly invaded the nonjudicial power of appropriation.

We agree. In a valid exercise of its constitutional powers, the Legislature had directed each of these sums to specific agencies and narrow purposes which did not include the District and its financial emergency. Hence, the Legislature had not made these funds reasonably available for disbursement to the District. By diverting the funds from their earmarked destinations and purposes, the court invaded the Legislature's constitutional authority.

Article III, section 3 of the Califonia Constitution provides that "[t]he powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." Article XVI, section 7 provides that "[m]oney may be drawn from the Treasury only through an appropriation made by law and upon a Controller's duly drawn warrant." Article IV, sections 10 and 12 set forth the respective powers of the Legislature and Governor over the enactment of appropriations. It has long been clear that these separation-of-powers principles limit judicial authority over appropriations. (*Myers* v. *English* (1858) 9 Cal. 341, 349; see *Westinghouse Electric Co.* v. *Chambers* (1915) 169 Cal. 131, 135 [145 P. 1025]; *California State Employees' Assn.* v. *Flournoy* (1973) 32 Cal.App.3d 219, 234 [108 Cal.Rptr. 251]; see also *Payne* v. *Superior Court* (1976) 17 Cal.3d 908, 920, fn. 6 [132 Cal.Rptr. 405, 553 P.2d 565].)

In certain narrow circumstances, California courts have concluded that judicial orders for the disbursement of appropriated funds do not invade valid legislative functions. *Mandel* v. *Myers, supra,* 29 Cal.3d 531, is the only decision by this court which found judicial power to "commandeer" appropriated funds. The facts and analysis of that case demonstrate the strict limits on the judicial authority it recognized.

The plaintiff in *Mandel*, a Department of Health Services (DHS) worker, had prevailed in litigation challenging DHS's practice of allowing paid employee leave on Good Friday. The judgment against the State included an award of attorney fees. However, the Legislature removed appropriations for payment from successive claims and budget bills, including the 1978-1979 Budget Act (Act). The Act included the usual appropriation to DHS for "general operating expenses and equipment," which expressly included expenses for "services" and "all other proper purposes." Such "catchall" budget categories for State agencies had traditionally been used to pay agency legal expenses. However, the Act expressly precluded use of any appropriation therein "to achieve any purpose which has been denied by any formal action of the Legislature."

We upheld the trial court's order that the Controller pay the fee award from the general operating budget of DHS. We noted first that the "catchall" appropriation was "reasonably" or "generally" available for payment of legal expenses incurred by DHS, because the broad terms of the appropriation, as well as its historical uses, indicated such a legislative intent. In effect, we concluded that the Legislature had voluntarily made an appropriation for payments of this general kind. (*Mandel* v. *Myers, supra,* 29 Cal.3d at pp. 539-545.)

We further explained that, once having made an appropriation generally available, the Legislature may not impose specific restrictions which are unconstitutionally discriminatory, or which constitute an impermissible legislative attempt to readjudicate the merits of a final court judgment. Hence, we reasoned, the Legislature's attempt to avoid payment of the *Mandel* award in particular must be struck down. The DHS "catchall" appropriation thus remained "available" under its general terms for payment of the judgment. (*Mandel* v. *Myers, supra,* 29 Cal.3d at pp. 545-551.)

Subsequent Court of Appeal decisions adhered to these principles of *Mandel.* In *Serrano* v. *Priest* (1982) 131 Cal.App.3d 188 [182 Cal.Rptr. 387], attorneys who had won the school-finance class action sought judicial help after the State rebuffed their informal efforts to collect a court-ordered fee award. After *Mandel* was decided, the State conceded that the trial court had properly ordered payment from a "catchall" appropriation to the Department of Education, the SPI, and the State Board of Education for "operating expenses and equipment." (Pp. 197-198.) In *Committee to Defend Reproductive Rights* v. *Cory* (1982) 132 Cal.App.3d 852 [183 Cal.Rptr. 475], the court concluded, after disregarding an unconstitutional budget act provision against use of Medi-Cal funds for abortions (see *Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252 [172 Cal.Rptr. 866, 625 P.2d 779, 20 A.L.R.4th 1118]), that abortion funding could be ordered from monies appropriated for other Medi-Cal pregnancy services. (132 Cal.App.3d at pp. 857-858.)

Plaintiffs and the SPI suggest that two more recent Court of Appeal decisions, *Long Beach Unified Sch. Dist.* v. *State of California* (1990) 225 Cal.App.3d 155 [275 Cal.Rptr. 449] and *Carmel Valley Fire Protection Dist.* v. *State of California* (1987) 190 Cal.App.3d 521 [234 Cal.Rptr. 795], have expanded *Mandel's* concept of "reasonable [or] general availability." The trial court in the instant case apparently relied on these decisions to conclude that it could divert the GAIN and OUSD appropriations to the District because they were "generally related" to education.

*Long Beach* and *Carmel Valley* do make occasional use of the term "generally related" to describe *Mandel's* principle of reasonable or general

"availability." (See *Long Beach, supra,* 225 Cal.App.3d at p. 181; *Carmel Valley, supra,* 190 Cal.App.3d at p. 541.) But nothing in those cases supports the trial court's apparent view that funds appropriated for one specific educational purpose may be judicially diverted to another. So far as the face of the opinions discloses, the stated intent of the target appropriation in each case, or its historical uses, indicated that the court's application of the funds was plausibly within purposes the Legislature might have contemplated.[25] No court has suggested that *Mandel* principles permit court-ordered diversion of an appropriation away from a clear, narrow, and valid purpose specified by the Legislature. We affirm that the words "generally related," as used in *Long Beach* and *Carmel Valley,* do not countenance such judicial incursions into the legislative power over appropriations.[26]

The instant trial court misapplied *Mandel* when it authorized the diversion of appropriated funds from the specific purposes and programs for which the Legislature had validly earmarked them. Nine million dollars was taken from an appropriation in the 1989-1990 Budget Act for the GAIN program. (Stats. 1989, ch. 93, § 22.00.) GAIN's purpose is to provide employment, adult

---

[25]In *Carmel Valley,* the Court of Appeal struck down budgetary language which had been inserted to foreclose the constitutionally required reimbursement of local agencies for expenses incurred in upgrading firefighter protective clothing as mandated by the State. (See Cal. Const., art. XIII B, § 6.) After disregarding these unconstitutional restrictions, the Court of Appeal quite logically determined that funds appropriated to the Department of Industrial Relations for Program 40, the Prevention of Industrial Injuries and Deaths of California Workers, were available for this expense. (*Carmel Valley, supra,* 190 Cal.App.3d at p. 541.) In *Long Beach,* a local school district sought reimbursement for the State-mandated expenses of developing desegregation programs. After the Legislature deleted an appropriation for this purpose from the 1985-1986 budget bill, the district obtained a trial court order for reimbursement from specified line-item accounts related to education, and from the general operating budget of the Department of Education, which had mandated the programs. The Court of Appeal affirmed on grounds that the record substantially supported the trial court's order. As the Court of Appeal explained, these and similar accounts had historically been used to support programs such as the one for which reimbursement was sought, and were logical sources of funding for this specific purpose. (*Long Beach, supra,* 225 Cal.App.3d at pp. 181-182; see also p. 185.)

[26]We are aware that in *Missouri v. Jenkins, supra,* 495 U.S. 33, the United States Supreme Court upheld the power of federal courts to order local tax levies to enforce judicial remedies for unconstitutional school segregation. However, even if the federal Constitution permits federal courts to impose far-reaching remedies for State government violations of federal constitutional rights, it does not follow that California courts are exempt from the constraints imposed by the California Constitution upon their power to invade the functions of a coequal branch of State government.

Indeed, the California Constitution's separation of powers clause precludes any branch from usurping or improperly interfering with the essential operations of either of the other two branches. (See Cal. Const., art. IV, § 1 [legislative power]; Cal. Const., art. V, § 1 [executive power]; Cal. Const., art. VI, § 1 [judicial power].) Nothing in this opinion should be interpreted as sanctioning or immunizing such unconstitutional interference, or as addressing the question of the appropriate remedies that may be invoked in the event one branch improperly impinges on the essential operations of a coequal branch.

education, and job training to recipients of public assistance. (Welf. & Inst. Code, § 11320 et seq.) Local school districts can receive GAIN funds for adult education and training classes (*id.*, §§ 11320.8, 11322, 11323), and the Legislature intended that the 1989-1990 GAIN appropriation might include such funding subject to strict conditions (see Stats. 1989, ch. 93, § 22.00, subd. (b)). However, this appropriation was expressly designated for that program alone and was not intended to fund the needs of non-GAIN students. Nothing in the trial court's order restricted use of the GAIN-derived funds to uses contemplated by the appropriation.

Similar considerations govern the remaining $10 million of the emergency loan, which was derived from the 1989 Legislature's special appropriation for the OUSD. This appropriation, by its express terms, was "for the purpose of an emergency loan *to [that] [d]istrict* in compliance with Article 2 (commencing with Section 41320) of Chapter 3 of Part 24 of the Education Code." (Stats. 1989, ch. 1438, § 1, italics added.)

Section 41310 expresses the intent that emergency loans to distressed districts under section 41320 et seq. not occur "unless funds have been *specifically* appropriated *therefor* by the Legislature." (Italics added.) The statutory scheme imposes detailed conditions on emergency loans granted under its auspices (§§ 41320.1-41323), and the Legislature further refined the conditions on the OUSD appropriation to address the particular circumstances of that case (Stats. 1989, ch. 1438, §§ 2-9).

When it makes an appropriation to a specific district, under specific conditions addressed to the problems of that district, the Legislature clearly intends and contemplates that the appropriation will only be used for that purpose, and under those conditions. Hence, the appropriation is not reasonably available for court-ordered diversion to another district under different conditions.

The trial court, understandably anxious to resolve the crisis, concluded that it could fund its order from any monies previously appropriated "for a purpose that is reasonably related to educational purposes." The court found that the GAIN and OUSD appropriations were "reasonably related to the State's obligation to keep the Richmond schools open through June 14, 1991 . . . ."

As we have seen, however, the test of reasonable availability under *Mandel* does not extend to uses clearly outside the particular purpose for which an appropriation was reserved. The GAIN and OUSD appropriations were earmarked for purposes entirely distinct from the subject matter of this

lawsuit.[27] They were not reasonably available for court diversion to finance the remainder of the District's school term.

In her concurring and dissenting opinion, Justice Kennard claims that by flatly disclaiming judicial power to divert appropriations from the purposes specified by the Legislature, we adopt a "formalistic" and outmoded view of the separation of powers. Citing language from two United States Supreme Court decisions (*Mistretta* v. *United States* (1989) 488 U.S. 361 [102 L.Ed.2d 714, 109 S.Ct. 647]; *Nixon* v. *Administrator of General Services* (1977) 433 U.S. 425 [53 L.Ed.2d 867, 97 S.Ct. 2777]), she proposes that interbranch conflicts of this kind be resolved under a "pragmatic" and "flexible" case-by-case balancing test, in which the derogation of one branch's powers by another may be warranted to promote overriding objectives within the "constitutional authority" of the latter. Because both the OUSD and GAIN appropriations were "generally related" to elementary and secondary education, she reasons, diversion of these funds to the District was not a "great" or "extreme" intrusion upon the appropriations power, and the court's action was justified by its constitutional responsibility to District students.

We cannot accept these contentions. Our adherence to *Mandel* can hardly be deemed rigid or formalistic; our decision in that case strained to find a practical, sensitive, and principled balance between legislative and judicial power over appropriations. In effect, Justice Kennard urges abandonment of *Mandel*'s careful analysis in favor of a rule giving the judiciary unchecked power to override the valid budgetary acts of coequal branches.

However, nothing in the California or federal cases on which Justice Kennard relies even hints that a court may *nullify* a *specific and valid exercise* by the Legislature and the Executive of fundamental budgetary powers explicitly entrusted to those branches, simply for the purpose of

---

[27]No party or amicus curiae suggests that the purposes specified by the Legislature for these two appropriations were "improper or invalid . . . restriction[s]" on their use which may be disregarded by the courts. (*Mandel* v. *Myers*, *supra*, 29 Cal.3d at p. 542.) This is not a case where the Legislature, in defiance of the Constitution or the judicial branch, had prohibited use of appropriations for particular purposes to which they would otherwise logically extend.

We recognize that, at the May 2 hearing, counsel for the OUSD indicated his client had "no objection" to diversion of its loan appropriation for the court's purposes. The OUSD's position may not have been entirely altruistic; on April 29, counsel had committed the OUSD to accepting an influx of displaced District students but expressed concern about the disruption such a solution would cause. Even if the OUSD believed that diversion of its appropriation was in its own best interests, however, the OUSD could not unilaterally alter the terms and conditions the Legislature had imposed on the appropriation. Moreover, the OUSD's waiver was conditional; counsel made clear that the OUSD reserved its right to demand refunding of the OUSD appropriation "if and when [the OUSD] chooses to exercise its rights to request a loan from the state of [$]10 million at any time up until June 30, 1993."

satisfying a judgment or order that is *unrelated* to the appropriation. (Compare, e.g., *Mistretta* v. *United States, supra,* 488 U.S. 361, 380-384 [102 L.Ed.2d 714, 735-738] [Congress's creation of United States Sentencing Commission, a judicial-branch agency charged with establishing mandatory federal sentencing guidelines, did not usurp authority of individual judicial officers or grant forbidden legislative power to judicial branch]; *Nixon* v. *Administrator of General Services, supra,* 433 U.S. 425, 441-446 [53 L.Ed.2d 867, 889-893] [legislation vesting Administrator of General Services with limited control over presidential papers of resigned chief executive did not undermine authority of executive branch]; *Wilson* v. *Eu* (1991) 54 Cal.3d 471, 473 [286 Cal.Rptr. 280, 816 P.2d 1306] [Legislature's failure to reapportion justifies judicial adoption of reapportionment plan]; *Davis* v. *Municipal Court* (1988) 46 Cal.3d 64, 72-87 [249 Cal.Rptr. 300, 757 P.2d 11] [District attorney's statutory power to disapprove local misdemeanor-diversion program was not improper delegation of legislative authority; prosecutor's absolute discretion to prevent diversion by charging "wobbler" as felony did not constitute forbidden judicial power]; *Younger* v. *Superior Court* (1978) 21 Cal.3d 102, 115-118 [145 Cal.Rptr. 674, 577 P.2d 1014] [statute requiring Department of Justice to destroy individual's marijuana arrest and conviction records upon application after sentence is complete did not create impermissible conflict with executive clemency powers].)

The balance proposed by Justice Kennard in this case would elevate the judiciary above its coequal brethren, upset the delicate system of checks and balances, and stand the separation of powers clause on its head. Applying *Mandel*'s well-settled principles, we remain satisfied that the trial court acted in excess of its authority when it funded the District's loan with appropriations specifically earmarked by the Legislature for other purposes.[28]

CONCLUSION AND DISPOSITION

The District's financial inability to complete the final six weeks of its 1990-1991 school term threatened to deprive District students of their

---

[28]Although the instant record is silent on the point, Justice Kennard worries that there *may* have been no unearmarked educational appropriations available to enforce this trial court's order. She suggests further that such funds *may* also not be available under current laws and budgetary constraints to permit judicial enforcement of students' constitutional rights in similar future cases. These concerns have no practical effect in the instant lawsuit, because the State does not seek rescission of the District's loan, and the educational rights of the District's students are secure. In any event, we cannot overlook the fact that the urgency of the District's crisis denied the Legislature any opportunity to respond to the trial court's injunctive order. Once alerted by the trial court's constitutional ruling, however, the Legislature and the Governor have taken significant steps to prevent or remedy recurrences of the District's crisis. We may not assume they will fail or refuse to respond as necessary to our final determination of the State's constitutional responsibilities.

California constitutional right to basic educational equality with other public school students in this State. As the court further concluded, discrimination of this nature against education, a fundamental interest, could only be justified as necessary to serve a compelling interest. The State itself, as the entity with plenary constitutional responsibility for operation of the common school system, had a duty to protect District students against loss of their right to basic educational equality. Local control of public schools was not a compelling interest which would justify the State's failure to intervene.

The trial court thus properly ordered the State and its officials to protect the students' rights. The court also acted within its remedial powers by authorizing the SPI to assume control of the District's affairs, relieve the Board of its duties, and supervise the District's financial recovery. However, the court invaded the exclusive legislative power of appropriation by approving the diversion of appropriations for GAIN and the OUSD to an emergency loan for the District.

Accordingly, we reverse the trial court's remedial order of May 2, 1991, insofar as it approves funding of an emergency loan to the District from appropriations for the Oakland Unified School District and the Greater Avenues for Independence program. In all other respects, the court's orders of April 29 and May 2, 1991, are affirmed. The Court of Appeal is directed to remand the cause to the trial court for such further proceedings as may be appropriate under the views expressed in this opinion.

Panelli, J., Arabian, J., and George, J., concurred.

**LUCAS, C. J.,** Concurring and Dissenting.—I concur with the majority's conclusions regarding the constitutional obligations of the State of California (State) to assure educational equality. I would not, however, address the propriety of the sources approved by the trial court to provide an emergency loan.

In my view, we need not consider questions regarding the use of the Oakland Unified School District (OUSD) emergency appropriation or the unused appropriation for the Greater Avenues for Independence (GAIN) program because the issues are moot and their resolution will have no impact on the status quo in this case. As the majority notes, at the May 2, 1991, proceeding, the State continued to object to the trial court's order arising out of the April 29, 1991, hearing. That order required the State, Superintendent of Public Instruction (SPI) and Controller, at their discretion and "by whatever means they deem appropriate," to ensure Richmond students were not deprived of six weeks of education provided to other students within California. In addition to renewing its basic position on the merits of the

constitutional arguments, the State also objected to use of the specific funds proposed by the SPI and Controller. It offered no alternative sources of funding and appealed from both orders.

Before us, however, the State does not demand rescission of the court-approved loan or any change in the status of that funding. The funding was granted as a loan and a loan repayment agreement has been worked out by the parties. The State, acknowledging those facts, expressly asserts "We do not argue that the Controller must be compelled immediately to recover the money." In other words, it seeks no relief from the trial court's order granting payment from the challenged sources and compelling repayment of the funds under a prescribed repayment schedule.

Accordingly, as the SPI observes, the matter is moot. The State's response, found in its reply brief, is only that "the trial court in the next case will still be guided by, unless this court disapproves the test, the 'generally related' test set forth in *Carmel Valley [Fire Protection Dist.* v. *State of California* (1987) 190 Cal.App.3d 521, 540-541 (234 Cal.Rptr. 795)] and *Long Beach [Unified Sch. Dist.* v. *State of California* (1990) 225 Cal.App.3d 155, 181-182 (275 Cal.Rptr. 449)]." It does not assert that this issue is capable of evading review because of timing or that a present controversy over the use of these particular funds still exists. Instead, it seeks guidance only for the future. I would decline to render what would essentially be an advisory opinion here. (See *People* ex rel. *Lynch* v. *Superior Court* (1970) 1 Cal.3d 910, 912 [83 Cal.Rptr. 670, 464 P.2d 126] ["The rendering of advisory opinions falls within neither the functions nor the jurisdiction of this court"].)

**MOSK, J.,** Concurring and Dissenting.—I am in general agreement with the views expressed in Justice Kennard's concurring and dissenting opinion.

However, I cannot embrace the ill-advised concession that the trial court's order "did pose a potential for disruption of a function of the legislative branch" although the degree of potential disruption "is not great" and the purported infringement on the legislative function is "not substantial." (Kennard, J., *post,* conc. and dis. opn. at pp. 710, 711.)

The theory of potential interference with legislative functions to any extent is inconsistent with the ultimate conclusion that the funds used for the emergency loan were "reasonably related" to the educational purposes of the legislation, and, indeed, "the trial court's order furthered, rather than defeated, that valid legislative purpose." As persuasively observed in footnote 2, the "funds were appropriated for purposes reasonably and closely related

to the purpose for which the trial court ordered them to be used." (Kennard, J., *post*, conc. and dis. opn. at p. 711.)

Under the foregoing circumstances—with which I agree—there cannot be some conceptual interference, even though "not great," with the functions of the legislative branch.

With that caveat, I join the concurring and dissenting opinion.

**KENNARD, J.,** Concurring and Dissenting.—I agree with the majority that the threatened closure of the schools of the Richmond Unified School District (District) was such an extreme departure from prevailing educational standards as to infringe on the students' state constitutional rights to basic educational equality, requiring the State of California (State) to intervene to protect those rights.

I do not agree, however, that the trial court violated the separation of powers doctrine by ordering that emergency loan funds be made available from an unused special appropriation to the Department of Education and an unused emergency appropriation to the Oakland Unified School District (OUSD). The majority has, in effect, declared that although the students' right to education is fundamental, no means may exist by which our judicial system can enforce that right. In my view, the trial court's order was an appropriate and pragmatic resolution of a difficult case under extreme pressure. Because the Legislature had already appropriated the funds in question for educational purposes reasonably related to the District's needs, I discern no constitutional violation, and would affirm the trial court's orders in their entirety.

I

On April 17, 1991, the District, facing a $23 million budgetary shortfall, announced its schools would close on May 1, 1991, rather than as scheduled on June 14, 1991. Parents of students in the District's schools then filed a class action against the State and the District's board of education, alleging the closure would deprive children of their fundamental right to education and would violate equal protection guarantees. The trial court granted plaintiffs' motion for a preliminary injunction, finding that "education is a fundamental right in California [and] unless injunctive relief is granted children in the District will be denied six weeks of instruction that will be provided to every other child in the State." The trial court ordered the State, the Superintendent of Public Instruction (Superintendent), and the State Controller "to ensure that the students in the District are not deprived of six

weeks of public education while others within the state are not so deprived." The trial court added that "how these defendants accomplish this is up to the discretion of the defendants."

Thereafter, the Superintendent and the Controller proposed a plan to keep the schools open. They proposed that $19 million in unspent funds from two educational programs—from the Greater Avenues for Independence (GAIN) program and from an appropriation to the OUSD—be loaned to the District. After an evidentiary hearing, the trial court ordered the State Controller to disburse an emergency loan to the District from these funds. This court denied the State's motion to stay the order pending appeal, but transferred the case here.

## II

The majority holds that the trial court's remedial order violated the doctrine of separation of powers. Essentially, the majority reasons that by ordering that the unused funds be loaned to the District, the trial court impermissibly engaged in the appropriation of funds, an area of exclusive legislative concern.

The majority's conclusion originates from a fundamental misunderstanding of the separation of powers doctrine. Implicit in the majority's discussion is the assumption that under our tripartite scheme of government, particular powers can be definitively categorized as belonging to one of the three branches, and that these powers can never be exercised by a branch other than the designated branch. Thus, under the majority's approach, appropriation is exclusively a legislative function, and unless the Legislature has either appropriated funds for a specific purpose, or made a "catchall" appropriation under which a specific use of funds may fall, funds are simply not available for any purpose, no matter what rights are at stake.

This formalistic interpretation of the separation of powers concept is, however, contrary to modern understanding. The opinions of the United States Supreme Court, although not binding on this court in interpreting the separation of powers principles of the California Constitution, supply a persuasive body of case authority. Just as our state Constitution provides for the separation of the powers of government into three branches (Cal. Const., art. III, § 3), so does the federal Constitution segregate the branches of government (U.S. Const., art. I, § 1, art. II, § 1, & art. III, § 1).

The United States Supreme Court has "squarely rejected the argument that the Constitution contemplates a complete division of authority between the

three branches." (*Nixon* v. *Administrator of General Services* (1977) 433 U.S. 425, 443 [53 L.Ed.2d 867, 891, 97 S.Ct. 2777].) Rather than reading the federal Constitution as " 'requiring three airtight departments of government,' " the high court has adopted a "pragmatic, flexible approach." (*Id.* at pp. 443, 442 [53 L.Ed.2d at pp. 891, 890-891.) This approach, the court has explained, is supported by historical understanding. James Madison, one of the principal architects of the United States Constitution, wrote that the concept of separation of powers " 'd[oes] not mean that these departments ought to have no *partial agency* in, or no *control* over the acts of each other,' " but instead that " 'where the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free constitution are subverted.' " (J. Madison, The Federalist No. 47, pp. 325-326 (J. Cooke ed. 1961) (original italics), quoted in *Mistretta* v. *United States* (1989) 488 U.S. 361, 380-381 [102 L.Ed.2d 714, 735-736, 109 S.Ct. 647].) Thus, the basic purpose of the separation of powers is to guard against the concentration of power in the hands of one branch, but it is important to distinguish "partial agency" from those aggrandizements of power that pose genuine threats to the constitutional scheme.

The pragmatic and flexible approach favored by the nation's highest court is also appropriate because, in a society growing ever more complex, the practical requirements of efficient government action by each of the three branches must be considered. " 'While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government.' " (*Mistretta* v. *United States*, *supra*, 488 U.S. at p. 381 [102 L.Ed.2d at p. 736], quoting *Youngstown Sheet & Tube Co.* v. *Sawyer* (1952) 343 U.S. 579, 635 [96 L.Ed. 1153, 1199, 72 S.Ct. 863, 26 A.L.R.2d 1378] (conc. opn. of Jackson, J.).) In contemporary society, concerns about the workability of government are especially weighty.

Thus, the high court has not evolved a rigid classification of governmental powers as belonging exclusively to one branch or another. Instead, the court has stated that "the proper inquiry focuses on the extent to which [the act complained of] prevents [one of the three branches] from accomplishing its constitutionally assigned functions." (*Nixon* v. *Administrator of General Services*, *supra*, 433 U.S. at p. 443 [53 L.Ed.2d at p. 891]; *Mistretta* v. *United States*, *supra*, 488 U.S. at p. 383 [102 L.Ed.2d at pp. 737-738].) If the "potential for disruption is present," the court must then "determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority" of the branch whose action is challenged. (*Nixon* v. *Administrator of General Services*, *supra*, 433 U.S. at p. 443 [53

L.Ed.2d at p. 891]; *Mistretta* v. *United States, supra*, 488 U.S. at p. 383, fn. 13 [102 L.Ed.2d at p. 737].)

This court has expressed a similar understanding. We have recognized that the purpose of the doctrine of separation of powers "is to prevent one branch of government from exercising the *complete* power constitutionally vested in another [citation]; it is not intended to prohibit one branch from taking action properly within its sphere that has the *incidental* effect of duplicating a function or procedure delegated to another branch. [Citation.]" (*Younger* v. *Superior Court* (1978) 21 Cal.3d 102, 117 [145 Cal.Rptr. 674, 577 P.2d 1014] [original italics].)

More recently, this court reiterated that the separation of powers doctrine " 'has not been interpreted as requiring the rigid classification of all the incidental activities of government, with the result that once a technique or method of procedure is associated with a particular branch of the government, it can never be used thereafter by another.' . . . 'From the beginning, each branch has exercised all three kinds of powers.' " (*Davis* v. *Municipal Court* (1988) 46 Cal.3d 64, 76 [249 Cal.Rptr. 300, 757 P.2d 11] [citations and italics omitted].)

### III

A line of cases from California courts has established the principle that a court does not violate the separation of powers doctrine when it orders appropriate expenditures from already existing funds, if such funds are reasonably available for the expenditures in question. (*Mandel* v. *Myers* (1981) 29 Cal.3d 531, 540 [174 Cal.Rptr. 841, 629 P.2d 935]; *Long Beach Unified Sch. Dist.* v. *State of California* (1990) 225 Cal.App.3d 155, 180-181 [275 Cal.Rptr. 449]; *Carmel Valley Fire Protection Dist.* v. *State of California* (1987) 190 Cal.App.3d 521, 538-539 [234 Cal.Rptr. 795]; *Committee to Defend Reproductive Rights* v. *Cory* (1982) 132 Cal.App.3d 852, 856 [183 Cal.Rptr. 475].) The precise question in this case is whether funds can be considered "reasonably available" when they are not made part of a "catchall" appropriation under which the specific use of the funds may fall. The majority concludes that unless the funds are part of a "catchall" appropriation, they are not reasonably available.[1]

I would announce no such categorical rule. In my view, the proper inquiry is that set forth by the United States Supreme Court in *Nixon* v. *Administrator of General Services, supra*, 433 U.S. 425 and *Mistretta* v. *United States,*

---

[1]The majority purports to reaffirm the rule of these cases, but in fact undermines it. The "catchall" appropriation exception to the majority's rule could easily be eliminated if the Legislature took the time to label more specifically the purpose of each appropriation in a particular area. If the Legislature did so, there would be no possible remedy for the failure to fund any program, no matter how essential.

*supra*, 488 U.S. 361: To what extent does the challenged act of one branch interfere with another branch's performance of its constitutionally assigned functions? If there is some potential disruption, the court must then determine whether the challenged act is "justified by an overriding need to promote objectives within the constitutional authority" of the branch whose action is challenged. (*Nixon* v. *Administrator of General Services, supra*, at p. 443 [53 L.Ed.2d at p. 891]; *Mistretta* v. *United States, supra*, at p. 383, fn. 13 [102 L.Ed.2d at p. 737].)

Applying the principles followed by the high court in *Nixon* v. *Administrator of General Services, supra*, 433 U.S. 425 and *Mistretta* v. *United States, supra*, 488 U.S. 361, and by this court in cases such as *Younger* v. *Superior Court, supra*, 21 Cal.3d 102 and *Davis* v. *Municipal Court, supra*, 46 Cal.3d 64, I conclude that the trial court's order authorizing the Controller to disburse funds from the GAIN and OUSD accounts as an emergency loan to the District to assure the District's schools remained open did pose a potential for disruption of a function of the legislative branch.

The degree of potential disruption, however, is not great. As the trial court concluded, the funds that were the source of the emergency loan were appropriated for purposes reasonably related to the educational purposes served by the District.

The OUSD loan funds were appropriated by the Legislature for the precise purpose for which they were employed here—to alleviate a fiscal crisis in a local school district and prevent disruption of an ongoing educational program. (See Stats. 1989, ch. 1438, § 1.) Moreover, the trial court had before it an application for leave to intervene from the OUSD itself, in which the OUSD stated that the threatened closure of the nearby District "would place substantial and difficult burdens on OUSD as displaced Richmond students seek admission to Oakland Schools," that would be "extremely costly and disruptive" to the operation of the Oakland schools. The emergency loan fund for the OUSD was intended by the Legislature to avoid disruption of the educational program at the Oakland schools, and the trial court's order furthered, rather than defeated, that valid legislative purpose.

The GAIN program was enacted to address the problem of teenage parenting, basic educational deficiencies, and long-term welfare dependency. Specifically, GAIN was intended to "[p]rovide the education and training services needed by teenage parents to help them earn a high school diploma or its equivalent," and to "[l]ink teenagers to other needed health and social services." (Welf. & Inst. Code, § 11330, subd. (c).) The purpose of the particular appropriation to the Department of Education at issue in this case

was solely to meet educational needs, and not to provide health and social services. (Stats. 1989, ch. 93, § 22.00.) This goal is served by keeping the District's schools open. The trial court had before it uncontradicted evidence that a large number of the students in the District came from low-income families, many of whom were welfare-dependent. The court could rationally conclude that the otherwise unused GAIN funds were reasonably available to meet the basic educational needs of the District's students, a significant portion of whom were in the welfare-dependent population the GAIN program was targeted to assist. Under the circumstances, the funds were ordered to be used for a purpose reasonably congruent with the statutory purpose.[2]

Thus, because the trial court authorized the OUSD and GAIN funds to be used for a purpose that was reasonably related to the purposes for which the funds were appropriated, any infringement on the legislative function is not substantial. By contrast, we are not faced with a situation in which a trial court has ordered that funds appropriated for one purpose be used for some entirely unrelated purpose; nor are we confronted with a trial court order that funds actually in use for one program be diverted to another. It is vital that

---

[2]The majority asserts that this opinion "urges abandonment" of the rule of *Mandel* v. *Myers, supra,* 29 Cal.3d 531 (*Mandel*). This is incorrect.

In *Mandel, supra,* 29 Cal.3d 531, this court held that the separation of powers doctrine does not prevent the courts from ordering appropriate expenditures from already existing funds when such funds are "reasonably available for the expenditures in question . . . ." (*Id.* at p. 542.) There, the court found that certain "catchall" funds were reasonably available for the expenditures in question, the payment of attorney fees in a case enforcing constitutional rights. But nothing in *Mandel* indicated that the only funds that might ever be reasonably available in any case were "catchall" funds. And, as later cases made clear, *Mandel*'s test of "reasonable availability" encompasses unused funds that have been appropriated for purposes closely related to the purposes for which they are sought to be expended. (*Long Beach Unified Sch. Dist.* v. *State of California, supra,* 225 Cal.App.3d at p. 181; *Carmel Valley Fire Protection Dist.* v. *State of California, supra,* 190 Cal.App.3d at p. 541.)

In this case, as my analysis has demonstrated, the OUSD and GAIN funds were appropriated for purposes reasonably and closely related to the purpose for which the trial court ordered them to be used. Thus, *Mandel* and its progeny were not violated. The analysis in this opinion is entirely consistent with both the *Mandel* line of cases, and the cases from the United States Supreme Court and this court that more fully and generally articulate the doctrine of separation of powers. *Mandel* and its progeny represent an area of specific application of general separation of powers principles; properly understood, there is no disjunction between the *Mandel* line of cases and cases such as *Nixon* v. *Administrator of General Services, supra,* 433 U.S. 425, and *Mistretta* v. *United States, supra,* 488 U.S. 361, that set forth a principled and coherent view of the separation of powers doctrine.

Thus, the majority's accusation that the approach to separation of powers questions set forth in this opinion, which is the same approach employed by our nation's highest court, would "stand the separation of powers clause on its head," is meritless.

trial courts take care to minimize any impingement on legislative preroga-
tives. But the trial court in this case did use the least intrusive means
available to it to ensure the students' rights.[3]

As discussed earlier, if there is some cognizable interference with the
functions of another branch, the reviewing court must then determine
whether the act is "justified by an overriding need to promote objectives
within the constitutional authority" of the branch whose action is challenged.
(*Nixon* v. *Administrator of General Services, supra,* 433 U.S. at p. 443 [53
L.Ed.2d at p. 891]; *Mistretta* v. *United States, supra,* 488 U.S. at p. 383, fn.
13 [102 L.Ed.2d at p. 737].) In my view, here the trial court's order was so
justified.

The objective that the trial court sought to achieve by its orders in this
case—to assure the protection of the fundamental rights of the District's
students—was unquestionably within its constitutional authority. As this
court has made clear on previous occasions, and as the majority reaffirms
today, education is a fundamental right under the California Constitution.
(*Serrano* v. *Priest* (1971) 5 Cal.3d 584, 608-609 [96 Cal.Rptr. 601, 487 P.2d
1241, 41 A.L.R.3d 1187]; *Serrano* v. *Priest* (1976) 18 Cal.3d 728, 766 [135
Cal.Rptr. 345, 557 P.2d 929].)

Moreover, the court, in acting to protect the students' rights to education,
had no practical alternative to the remedial order it issued. It was the court's

---

[3]At the hearing on the preliminary injunction, an official of the Department of Education
testified without contradiction that there were two sources from which department funds were
available that could be employed to assist the District—the OUSD fund and the GAIN fund.
No other funds were identified as available.

The funds appropriated to the Department of Education for the general support of elemen-
tary and secondary schools are not placed in a "catchall" fund subject to the discretion of
Department of Education officials. Instead, under the Education Code, virtually all sums
transferred from the state's general fund to the Department of Education for the general
support of elementary and secondary education are transferred subject to a strict formula
under which each local district is entitled to an amount computed on the basis of average daily
student attendance. (Ed. Code, § 14000 et seq., § 46000 et seq.) No state official appears to
have any discretion to vary the legislatively mandated allocation of funds.

My research reveals that the only funds that might have been considered reasonably
available to aid the District under the majority's criteria at the time of the trial court's
decision in this case were certain emergency funds under control of the Director of Finance.
(Stats. 1990, ch. 467, § 2.00.) But there is nothing in the record to show that these funds had
not been used for some other emergency purpose. Even assuming that none of these funds had
been committed to some other use, however, the funds would have been grossly inadequate to
meet the District's needs in any event. The total amount of funds available to the Director of
Finance to meet all the emergency needs of the State under the then-current budget was $7
million. (*Ibid.*) As we have seen, the District faced a $23 million budget shortfall.

duty to act. As the United States Supreme Court has held, "a denial of constitutionally protected rights demands judicial protection; our oath and our office require no less of us." (*Reynolds* v. *Sims* (1964) 377 U.S. 533, 566 [12 L.Ed.2d 506, 530, 84 S.Ct. 1362].)

When the other branches of government have failed to act, the courts have not flinched from their duty to fashion appropriate remedies when necessary to guarantee constitutional rights to the people of this state. Thus, in *Wilson* v. *Eu* (1991) 54 Cal.3d 471, 473 [286 Cal.Rptr. 280, 816 P.2d 1306], we held that, although reapportionment is primarily a matter for the legislative branch, when that branch has failed to act and electoral rights will be irretrievably lost if no action is taken, "we must proceed forthwith to draft such [reapportionment] plans." And in *Crawford* v. *Board of Education* (1976) 17 Cal.3d 280, 307 [130 Cal.Rptr. 724, 551 P.2d 28], we held that when a recalcitrant school board failed to act to cure the harmful consequences of school segregation, the trial court could exercise "broad equitable powers" to frame a remedy that would assure the students' basic rights. (Accord, e.g., *Swann* v. *Board of Education* (1971) 402 U.S. 1, 15 [28 L.Ed.2d 554, 566, 91 S.Ct. 1267]; see *Assembly* v. *Deukmejian* (1982) 30 Cal.3d 638, 659 [180 Cal.Rptr. 297, 639 P.2d 939]; *Midway Orchards* v. *County of Butte* (1990) 220 Cal.App.3d 765, 779 [269 Cal.Rptr. 796].)

No sound reason exists to hold that although some fundamental rights demand judicial protection when they are endangered because the other branches of government have failed to act, other rights, equally fundamental, do not. Yet that is the consequence of the majority's holding in this case that the trial court erred in ordering that an emergency loan be made to the District.

The practical consequences of the majority's holding should not be overlooked. In an era of fiscal constraint and uncertainty for local governments, including school districts, we cannot assume that the District's problems will prove to be unique. If another school district experiences financial difficulties and the other branches of government fail to act, parents may indeed bring a lawsuit to protect their children's right to education. Under today's decision, the trial court will declare that the children have a constitutional right to basic educational equality, and that the State bears responsibility for assuring this right is not denied. The court may then announce that no means

exist by which it can enforce that right. And the doors to the schoolhouse will close.

I would affirm the orders of the trial court in their entirety.