Filed 6/2/22 Chi Chi Beignet v. Khan CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

<table>
<tr><td>

CHI CHI BEIGNET, INC.,

      Plaintiff and Respondent,

v.

SAEED KHAN et al.,

      Defendants and Appellants.

</td><td>

A160048

(City & County of San Francisco
Super. Ct. No. CGC-19-575726)

</td></tr>
</table>

This dispute is between two commercial tenants in a trilevel building in the heart of San Francisco's theatre district. Defendants operate a ground floor fast-food restaurant directly above plaintiff's basement level nightclub. After sewage and other waste flooded into the nightclub, plaintiff sued defendants and sought temporary injunctive relief. The trial court initially denied the motion but later granted plaintiff's request for reconsideration and issued a preliminary injunction prohibiting defendants from using their on-premises plumbing and leaking appliances until repairs are made. On appeal, defendants first contend the trial court erroneously granted plaintiff's motion for reconsideration. Second, defendants claim the trial court abused its discretion in issuing the preliminary injunction because plaintiff was not likely to prevail and the balance of harms favored defendants rather than plaintiff. Finding no error, we affirm.

1

# BACKGROUND

## I. The Parties and the Property

Plaintiff and respondent Chi Chi Beignet, Inc., doing business as Biscuits and Blues (plaintiff or BB), operates a nightclub featuring live music and Southern cuisine. The nightclub is in the basement level of a trilevel building in San Francisco. On the ground level directly above plaintiff's club is a Jack in the Box, Inc. (JITB) franchise restaurant operated by defendants Saeed Khan and Gul Food Management, Inc. (defendants or JITB).[1]

Meiyan Enterprises, Inc. is the owner and landlord (owner or landlord) of the building. JITB[2] entered a lease agreement (Lease) with the owner in 1985 for commercial space. At the time, the commercial space was undeveloped. (Lease, at pp. 1–2.) JITB agreed to build out the empty space, including "plumbing fixtures," and in doing so agreed, "[a]ll such work shall be exclusively at Tenant's risk and expense." (Lease, at p. 2, art. 3.) JITB further agreed to "waive[] the right to claim against Landlord for any cause directly or indirectly arising out of the condition of the Premises, appurtenances thereto, the improvements thereon and the equipment thereof; and [JITB] shall thereafter save and hold harmless Landlord from liability . . . . Tenant shall be liable for any latent or patent defects therein. . . . [¶] Tenant shall hold Landlord harmless and indemnify Landlord for any loss or damage to Landlord's property, fixtures, equipment, and merchandise and for injury to any persons, incurred as a result of tenant's

---

[1] A nonparty Mongolian restaurant leases the upper level of the building above JITB.

[2] The original lessee was Ralston Purina Company, which then assigned its rights under the Lease to Foodmaker, Inc., which later changed its name to Jack in the Box, Inc.

construction work, unless the same be caused by the active negligence of Landlord . . . ." (Lease, at p. 3.)

Article 5, section 5.02.03 of the Lease specified, "[JITB] shall not use the Premises in any manner that will constitute waste, nuisance, or unreasonable annoyance to owners or occupants of adjacent properties." (Lease, at p. 7.) Article 6, section 6.02 of the Lease further provided that "Landlord shall maintain and repair structural portions of the Premises, which structural portions include the exterior roof and exterior walls . . . ." Lease, at p. 8.) Pursuant to article 6, section 6.03 of the Lease, JITB, "at its cost shall maintain the Premises in good condition. Landlord shall not have any responsibility to maintain the Premises." (Lease, at p. 8.) And in 2008, JITB 2008, replaced "4 [feet] sewer pipe [and] about 100 [feet] horizontal waste pipes."

## II.   Sewage and Water Leaks into Plaintiff's Nightclub

BB, JITB, and the upper-level tenant all share a single sewage lateral line that runs from the building to the city sewer system. On October 7, 2017, BB's business operations were interrupted by water and sewage coming into the club from the upstairs tenant, JITB. These intrusions continued for the next two and a half years. Plaintiff notified JITB each time water and sewage flooded into BB.

On April 17, 2019, one of BB's employees noticed a pungent and foul odor upon entering the club. The employee found a puddle of brown water surrounding one of the dining tables. Nearby tables were also wet. The sewer pipes were located directly above the wet tables. The employee immediately told BB owner Steven Suen about the leak and also notified the JITB repair person who had addressed previous leaks. JITB's repair person reported he completed the plumbing repairs the next day, April 18. One day

3

later, April 19, a new leak was discovered. JITB reported it repaired the plumbing on April 20. On April 23, BB employees found wetness around a table and heard the sound of a leak coming from the ceiling. JITB was again notified; the repair person did not respond. The next day, April 24, an arriving employee was "immediately overwhelmed" upon entry by an "unbearable pungent odor." The entire main floor was covered with at least 1 inch of water. All of the tables in the dining room, the bar area, the music equipment area, and the kitchen were covered with foul smelling raw sewage. The ceiling and walls were oozing with sewage and water. The sewage and water leaks saturated the club's ceiling to such a degree that it collapsed, rendering BB completely inoperable.

### III. Commencement of Litigation and Request for Injunctive Relief

On May 6, 2019, BB filed an action against defendants, alleging nuisance and negligence causes of action and seeking injunctive relief. BB alleged JITB, by its negligence, created, maintained, and failed to repair a serious public health nuisance. On June 5, 2019, BB moved for a temporary restraining order and preliminary injunction to enjoin JITB from operating its business until it ceased discharging raw sewage and wastewater into BB. BB also requested that JITB remove and repair black mold caused by the wastewater discharges into the club.

BB submitted the following declarations in support of its motion: (1) Steven Suen, the owner of the club, attested to the interruptions to his business caused by JITB's plumbing; (2) Nick Kaniuga, staff assistant, attested to the wastewater and raw sewage that flooded plaintiff's club in April 2019; (3) Ray Bacon, plaintiff's counsel, attested to communications with defense counsel in which defense counsel made false representations that the water and sewage problem had been resolved; and (4) Clay Hogan,

4

retired plumbing contractor, attested to the condition of the sewer lines and opined there was a negative grade on the lines impeding drainage. The negative grade was causing the sewer lines to rot from the inside out. Hogan explained that the plumbers hired by JITB to remediate the situation failed to perform in a workmanlike manner. Among other things, JITB's plumbers failed to ensure proper protection of the property and lacked proper planning. Hogan further explained that JITB's contractors were not allowed back in the club because they had not produced a plan for eradicating the mold and replacing the decrepit plumbing. BB also submitted photographic and video evidence[3] documenting the water and sewage that flooded the club, as well as the damage to the pipes, ceiling, and other areas of the club.

In response, JITB asserted defendants were not responsible for maintaining the sewer lines; the landlord/building owner was. JITB argued that the terms of the Lease did not render defendants responsible for maintaining the internal or external building systems; JITB was only required to maintain the interior of their premises.

Defendants submitted the following declarations in support of their opposition: (1) Mark Hunter, plumbing expert, attested to BB's sewage ejection system and opined that when effluent from BB's pumped waste is directed upward into the sewage pipes, it overflows into JITB's sinks, floor drains, and toilets. These in turn leak into BB's unit below; the communal sewer lateral is likely corroded; (2) Saeed Khan, CEO of Gul Food Management, Inc., attested it is the landlord's responsibility to maintain the plumbing system under the Lease; and (3) Joseph Filmus, plumbing contractor, attested to the repair work he attempted to perform on the

---

[3] We have reviewed the photographs. However, the videotape is not part of the designated record on appeal.

5

plumbing within BB, which plaintiff halted. Defendants also presented evidence from commercial real estate expert, David Klein, who, after reviewing the Lease, opined the tenant would be responsible for the plumbing fixtures, but the landlord had responsibility for the plumbing systems.

## IV.    Trial Court's Ruling

The court heard BB's motion on June 18, July 2, and July 29, 2019.[4] At the initial June 18 hearing, the trial court emphasized that it was seeking to devise a flexible remedy, fair to all parties, which would allow at least temporary relief from the unquestionable, ongoing irreparable injury to plaintiff.

After taking the matter under submission in July, on September 3, 2019, the trial court issued an order that denied BB's specific relief requested but provided an alternative relief opportunity: "Preliminary Injunction as requested is DENIED. However, the Defendant [Saeed Khan and dba Jack in the Box], operating a business in the unit above the Plaintiff [Biscuits & Blues], is ordered to continue its operation in a manner not causing any damage [as described in the Complaint and in the Preliminary Injunction briefs] and not interfering with Plaintiff's occupancy. If any further damage in the nature complained of in this action occurs, Plaintiff may appear ex-parte to seek immediate relief. The parties are strongly encouraged to seek a speedy resolution regarding the repairs of the existing damage and the cause of such damage."

## V.    Plaintiff's Motion for Reconsideration

On September 16, 2019, BB filed a motion for reconsideration based on the existence of continuing unabated leaks and growing unabated mold. It

---

[4] The three-week gap between to the last two hearings was to encourage the parties to resolve factual issues through mediation.

6

presented a declaration from club owner Suen, attesting that water again leaked into the club on August 2, 2019. Suen further attested that leaks continued to occur and mold continued to grow due to JITB's leaking freezers. BB submitted photographs and a video[5] documenting the ongoing leaks. Plaintiff also submitted JITB's completed building plans, which defendants first provided on August 26, 2019, well after the last restraining order hearing. The plans show the plumbing installed by JITB, including tie-ins to the waste and sewage lines. BB submitted correspondence from the landlord's attorney, in which counsel, citing to article 3 of the Lease, advised defendants the landlord "is not obligated to indemnify or defend you" in connection with plaintiff's action because the action "arises out of alterations made by you."

In opposition, defendants asserted that the Lease obligated the landlord to repair the building's systems; JITB's appliances were installed to code requirements and industry standards in 1985; and BB had not informed them of any new leaks.

While the motion for reconsideration was pending, the court granted plaintiff leave to amend its complaint to add allegations related to water intrusions from JITB's refrigeration system and leaking freezers. In supplemental briefing following the amendment, defendants renewed their opposition asserting they were not responsible for maintaining the plumbing system; any water intrusions were the result of normal wear and tear on the building; and BB's requested repairs were impossible for defendants to complete.

---

[5] We have reviewed the photographs, but not the video as it is not included in the record on appeal.

## VI. The Preliminary Injunction

On February 10, 2020, following a contested hearing, the trial court granted plaintiff's motion for reconsideration and issued a preliminary injunction against defendants. The trial court determined BB had demonstrated it would likely prevail on the merits, and the balance of hardships favored plaintiff as BB would continue to suffer irreparable harm without an injunction. The court also found that other legal remedies were inadequate as demonstrated by plaintiff's inability to remediate the mold, "because so long as there is continued use of the plumbing and appliances, leaks will occur on Defendants' premises, and Plaintiff's premises will continue to have mold." The court noted that "[m]ediation led to plumbing repairs" in JITB in January 2020, but the "repairs have yet to pass inspection by the City and County of San Francisco. Defendants continue to use refrigerators and freezers that leak into Plaintiff's business." As a result, the court determined plaintiff "continues to suffer irreparable harm."

The court issued the following injunction: "Defendants are enjoined from using plumbing on the premises located at 400 Geary Street, San Francisco, CA 94102 until the plumbing repairs pass inspection by the City and County of San Francisco. [¶] Defendants must stop any leaks from the refrigerators and freezers up to and including unplugging the appliances."

This timely appeal followed.

## DISCUSSION

### I. Motion for Reconsideration

Defendants contend the trial court erred in granting plaintiff's motion for reconsideration because plaintiff failed to comply with the requirements of Code of Civil Procedure section 1008; there were no changed circumstances.

8

*A.     Applicable Law and Standard of Review*

Code of Civil Procedure[6] section 1008, subdivision (a) authorizes a party to seek reconsideration of an adverse order "based upon new or different facts, circumstances, or law."  Similarly, section 1008, subdivision (b) provides, "[a] party who originally made an application for an order which was refused in whole or part . . . may make a subsequent application for the same order upon new or different facts, circumstances, or law" set forth in an accompanying affidavit.  (See *Global Protein Products, Inc. v. Le* (2019) 42 Cal.App.5th 352, 362 ["Section 1008 describes applications for reconsiderations of court orders (§ 1008, subd. (a)) and renewals of previous motions (§ 1008, subd. (b))."].)  The moving party must "show diligence with a satisfactory explanation for not presenting the new or different information earlier . . . ."  (*Even Zohar Construction & Remodeling, Inc. v. Bellaire Townhouses, LLC* (2015) 61 Cal.4th 830, 833.)

We review a trial court's ruling on a motion for reconsideration under the abuse of discretion standard.  (*New York Times Co. v. Superior Court* (2005) 135 Cal.App.4th 206, 212.)

*B.     No Abuse of Discretion*

Defendants argue the trial court abused its discretion in granting plaintiff's motion for reconsideration because plaintiff failed to identify any new or different facts, circumstances, or law.  They assert plaintiff's motion raised the same leaks and water intrusions that had "already been addressed by the court and deemed insufficient to support injunctive relief."  To the extent BB's motion for reconsideration raised circumstances not specifically addressed at the initial hearing, they assert that these "new facts" were

---

[6] Further undesignated statutory references are to the Code of Civil Procedure, unless otherwise indicated.

9

previously either known by or able to be ascertained by BB; "there was no excuse for not raising them earlier during one of the many hearings on its motion." Thus, according to defendants, the trial court acted in excess of its jurisdiction in granting plaintiff's motion for reconsideration.

Defendants' argument is premised upon the incorrect characterization of the trial court's September 3, 2019 order denying plaintiff's motion for a preliminary injunction as a final order. The trial court denied the preliminary injunction *as requested*, but expressly ordered defendants to "continue its operation in a manner not causing any damage to . . . and not interfering with Plaintiff's occupancy." The order also specifically provided an avenue for further relief in the event "any further damage" occurred. As such, the September 3, 2019 order did not require satisfaction of section 1008 as a condition to further relief. BB had court-authorized authority to petition the court to address new or ongoing harm.

Even if the trial court's September 2019 order had been final, BB did provide evidence of changed circumstances sufficient to satisfy section 1008. BB presented evidence that, after the matter had been submitted on July 29, 2019, water again leaked into the club on August 2. BB further provided evidence of new leaks from JITB's freezers and subsequent mold growth on its ceiling. BB also submitted JITB's completed building plans that depict the plumbing installed by JITB, which defendants first provided to BB on August 26, 2019.

Accordingly, the trial court did not act in excess of its jurisdiction under section 1008 when it granted BB's motion for reconsideration.

## II.    Preliminary Injunction

Defendants next contend the trial court erred in issuing the preliminary injunction because "it is highly unlikely plaintiff will prevail at

trial on the merits," and "the equities weigh in favor of defendants because their business is currently operational."

### A. Standard of Review for a Preliminary Injunction

" 'Pursuant to long-standing Supreme Court case law, "trial courts should evaluate two interrelated factors when deciding whether or not to issue a preliminary injunction.  The first is the likelihood that the plaintiff will prevail on the merits at trial.  The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued." [Citation.]' " (*Urgent Care Medical Services v. City of Pasadena* (2018) 21 Cal.App.5th 1086, 1092.)  The greater the plaintiff's showing on one of these factors, the less must be shown on the other to support an injunction. (*Butt v. State of California* (1992) 4 Cal.4th 668, 678.)  But an injunction cannot issue "unless there is some possibility" that plaintiff will ultimately prevail on the merits of the claim.  (*Jamison v. Department of Transportation* (2016) 4 Cal.App.5th 356, 362.)

We review a trial court's application of these interrelated factors for abuse of discretion.  (*Urgent Care Medical Services v. City of Pasadena*, *supra,* 21 Cal.App.5th at 1092.)  The party challenging the injunction has the burden to make a clear showing of an abuse of discretion, and "[a] trial court will be found to have abused its discretion only when it has ' "exceeded the bounds of reason or contravened the uncontradicted evidence." ' " (*IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 69.)

When a "preliminary injunction mandates an affirmative act that changes the status quo, we scrutinize it even more closely for abuse of discretion.  'The judicial resistance to injunctive relief increases when the attempt is made to compel the doing of affirmative acts . . . .' [Citation.]  As

11

our Supreme Court noted many years ago, '[t]he granting of a mandatory injunction pending the trial, and before the rights of the parties in the subject matter which the injunction is designed to affect have been definitely ascertained by the chancellor, is not permitted except in extreme cases where the right thereto is clearly established and it appears that irreparable injury will flow from its refusal. [Citations.]' (*Hagen v. Beth* (1897) 118 Cal. 330, 331.)" (*Board of Supervisors v. McMahon* (1990) 219 Cal.App.3d 286, 295.)

"[Q]uestions underlying the preliminary injunction are reviewed under the appropriate standard of review. Thus, for example, issues of fact are subject to review under the substantial evidence standard; issues of pure law are subject to independent review." (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1136–1137.)

B.    *Law of Nuisance*

Under the Civil Code, a private nuisance includes "[a]nything which is injurious to health, . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property." (Civ. Code, § 3479.) The discharge of water and sewage onto another's property may constitute an interference with the present enjoyment of property amounting to a nuisance. (See *Mangini v. Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125, 1136; *Mulloy v. Sharp Park Sanitary Dist.* (1958) 164 Cal.App.2d 438.)

To prevail on an action for private nuisance, a plaintiff must first prove an interference with the plaintiff's use and enjoyment of his or her property. (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 938.) Second, "the invasion of the plaintiff's interest in the use and enjoyment of the land [must be] *substantial*, i.e., that it cause[s] the plaintiff to suffer 'substantial actual damage.'" (*Ibid.*) Third, "'[t]he interference with the

12

protected interest must not only be substantial, but it must also be *unreasonable'* [citation], i.e., it must be 'of such a nature, duration or amount as to constitute unreasonable interference with the use and enjoyment of the land.'" (*Ibid*.; accord, *Mendez v. Rancho Valencia Resort Partners, LLC* (2016) 3 Cal.App.5th 248, 262–263.)

"[T]he elements of substantial damage and unreasonableness necessary to making out a claim of private nuisance are questions of fact that are determined by considering all of the circumstances of the case." (*Mendez, v. Rancho Valencia Resort Partners, LLC, supra,* 3 Cal.App.5th at pp. 263–264), according to an objective standard (*id*. at p. 263). Specifically, whether a person of "normal health and sensibilities living in the same community" would be substantially damaged by the interference and whether an impartial reasonable person would consider the interference unreasonable. (*San Diego Gas & Electric Co. v. Superior Court, supra,* 13 Cal.4th at pp. 938–939.)

### C.    *No Abuse of Discretion in Concluding Plaintiff Is Likely To Prevail at Trial*

There is no serious dispute that BB has suffered an unreasonable interference or substantial damage. Rather, as in the trial court, defendants attempt to shift liability to the landlord. Defendants' primary argument is that they are not subject to nuisance liability because under the terms of the Lease: 1) they are not responsible for maintaining the plumbing system; and 2) it is impossible for them to perform the needed repairs.

13

### 1. *Responsibility*

Defendants argue they are not responsible for maintaining the plumbing system as it is part of the "structural portion of the premises."[7] Specifically, article 6, section 6.02 of the Lease provides, "Landlord shall maintain and repair structural portions of the Premises, which structural portions include the exterior roof and exterior walls . . . ."[8] (Lease, at p. 8.)

By contrast, plaintiff's position is that the Lease renders defendants liable, particularly in view of defendants' development of JITB and its installation of plumbing and refrigeration units. Article 3 governs JITB's construction and provides, in part, "All such work shall be exclusively at Tenant's risk and expense." (Lease, at pp. 1–2.) Further, JITB "waives the right or claim against Landlord . . . for appurtenances thereto, the improvements thereon and the equipment thereof; and Tenant shall thereafter save and hold harmless Landlord from Liability as provided in this

---

[7] For the first time on appeal, defendants claim BB cannot prevail on the merits because due to a purported novation, "the original Lease was terminated and any improvements made during the initial build-out of Premise's shell reverted to [landlord]." "A novation . . . amounts to a new contract which supplants the original agreement and 'completely *extinguishes* the original obligation . . . .' [Citations.] It must ' "clearly appear" that the parties intended to extinguish rather than merely modify the original agreement.' " (*Wells Fargo Bank v. Bank of America* (1995) 32 Cal.App.4th 424, 431–432.) Here, there is nothing in the record to establish the original Lease was extinguished, as opposed to merely assigned. Although the various amendments to the Lease reflect corporate name changes and modifications of the rent and length of term, the amendments expressly state that "In all other respects the terms and provisions of said Lease remain unchanged," thus JITB's novation argument fails.

[8] Article 1 of the Lease describes the "Premises" as "certain real property consisting of approximately 3,000 square feet on the ground floor together with approximately 1000 square feet of mezzanine floor area (to be constructed)." (Lease, at p. 1.)

14

Lease.  Tenant shall be liable for any latent or patent defects therein."
(Lease, at p. 3.)  The following paragraph additionally provides, "Tenant shall hold Landlord harmless and indemnify Landlord for any loss or damage to Landlord's property, fixtures, equipment and merchandise and for injury to any persons, incurred as a result of Tenant's construction work . . . ." (*Ibid.*)

Article 5, section 5.02.03 limits JITB's use of the premises to prohibit waste or nuisance: "Tenant shall not use the Premises in any manner that will constitute waste, nuisance, or annoyance to owners or occupants of adjacent properties."  Article 6.03 further requires JITB, at its cost, "to maintain the Premises in good condition.  Landlord shall not have any responsibility to maintain the Premises."

" 'When a dispute arises over the meaning of contract language, the first question to be decided is whether the language is "reasonably susceptible" to the interpretation urged by the party.  If it is not, the case is over.' " (*Oceanside 84, Ltd. v. Fidelity Federal Bank* (1997) 56 Cal.App.4th 1441, 1448.)  "If a contract is capable of two different reasonable interpretations, the contract is ambiguous." (*Ibid.*)  "The trial court's determination of whether an ambiguity exists is a question of law, subject to independent review on appeal.  [Citation.]  The trial court's resolution of an ambiguity is also a question of law if no parol evidence is admitted or if the parol evidence is not in conflict.  However, where the parol evidence is in conflict, the trial court's resolution of that conflict is a question of fact and must be upheld if supported by substantial evidence." (*WYDA Associates v. Merner* (1996) 42 Cal.App.4th 1702, 1710.)

Here, the parties submitted conflicting evidence supporting their respective interpretations of the Lease.  Defendants submitted a declaration from a commercial real estate expert who opined that under the Lease, the

15

tenant would be responsible for the plumbing *fixtures*, but the landlord had responsibility for the plumbing *systems*.[9] Plaintiff submitted building plans depicting the plumbing installed by JITB, as well as correspondence from the landlord disclaiming any liability under the Lease. In addition to containing and plotting a "Plumbing Fixture Schedule" and "Kitchen Equipment Schedule," these plans include direction to run and review routing lines "above basement club," tie into the water and service lines by "adjust[ing] routing as required to suit . . . meter location," and to review the service line, "with S.F. Water Department." Per the inspector, the ground floor "soil, waste & vent" plans require "a floor drain immediately outside walk-in freezer & cooler" and compliance "with DPH requirements 1 thru 50 attached to building plans." One notation specifies, "prior to commencing work, verify point of connection to establish routing slopes of entire underfloor soil & waste system. Critical areas shall be reviewed with building architect and structural engineer." The "Plumbing–Ground Floor Plan (Soil, Waste & Vent)" noted that JITB would do the following: "Prior to commencing any work, verify the exact location of outgoing sewer connection. Adjust 'point of connection' as req'd to suit actual conditions. Coordinate 'Jack in the Box'

_____

[9] "Plumbing fixture" is not independently defined in the Lease but, according to the International Plumbing Code cited by defendants' expert it is "A receptacle or device that is connected to a water supply system or discharges to a drainage system or both. Such receptacles or devices require a supply of water, or discharge liquid waste or liquid-borne solid waste; or require a supply of water and discharge waste into a drainage system." Similarly, the expert relied on the International Plumbing Code to define "plumbing system" as "[a] system that includes water distribution pipes; plumbing fixtures and traps; water-treating or water-using equipment; soil, waste and vent pipes; and building drains; in addition to their respective connections, devices, appurtenances within a structure or premise; and water service; building sewer and building storm sewer serving such structure or premises."

16

sewer connection w/ 'building sewer connection.' . . . Exact final invert elevation [at] 'point of connection' is req'd order to establish routing & pipe slopes of balance of soil & waste system."  Consistent with the original plans, in 2008, JITB relaced "4 [feet] sewer pipe [and] about 100 ft horizontal waste pipes."

Despite the arguably ambiguous language of the Lease, the record evinces far more than "some possibility" (see *Butt v. State of California, supra,* 4 Cal.4th at p. 678) that plaintiffs will prevail on the issue of responsibility, particularly in light of the unquestionable harm they continue to suffer.

### 2.    *Impossibility*

Defendants also assert that "Impossibility of performance" is a complete defense, eliminating any chance for plaintiff to prevail at trial. Defendants argue it is impossible for them to perform the needed plumbing and subfloor repairs because the terms of Lease simultaneously: 1) require the landlord to "maintain and repair structural portions of the Premises" (Lease, at p. 8, art. 6, § 6.02); and 2) prohibit defendants from making "any alterations whatsoever which affect the structural portions of the Premises without Landlord's consent, which shall not be unreasonably withheld." (Lease, at p. 8, art. 7.)  In addition, defendants argue comprehensive repairs are impracticable as the premises are not up to code and "the entire building is in need of a complete retrofit of the exterior as well as the foundation." They argue that plaintiff and landlord must make necessary repairs first, and even then, to make any remaining "illegal repairs," defendants would have to trespass on other tenants' property in violation of the Lease.

" ' "Whether a defendant owes a duty of care is a question of law." ' " (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 552.)  Here, however, defendants'

17

impossibility defense presents a mixed question of law and fact in view of the conflicting evidence presented by the parties regarding the interpretation of the Lease. (See *WYDA Associates v. Merner, supra,* 42 Cal.App.4th at p. 1710.) Accordingly, at this stage we cannot say the defendants' impossibility defense forecloses BB's nuisance action.[10]

In issuing the preliminary injunction, the trial court found plaintiff's evidence more persuasive, and we will not second-guess the trial court's determination on appeal. Given the substantial evidence supporting unreasonable interference and the extensive damage due to the water and sewage intrusions, the trial court's determination that plaintiff was likely to prevail at trial is not an abuse of discretion. Moreover, JTB's real disagreement appears to be with the landlord, not the plaintiff. Given the unquestioned substantial harm being caused to the plaintiff by the continuing leakage, the court certainly did not abuse its discretion in halting JITB's operations until JITB and landlord resolve their respective responsibilities to make the necessary repairs.

### D. *No Abuse of Discretion in Finding the Balance of Harms Favored Plaintiff*

Defendants also contend the trial court abused its discretion in granting the preliminary injunction because plaintiff could be made whole solely through monetary damages "without resorting to curtailing defendants' business activities." They assert that because San Francisco ordered the closure of indoor bars and restaurants like BB until May 6, 2021, to mitigate the spread of COVID-19, while take-out restaurants like JITB were

---

[10] Defendants' suggestion that BB cannot prevail on its nuisance claim because "any water intrusions into plaintiff's club from defendants' refrigerators and freezers is the result normal wear and tear" is an inherently factual issue and thus does not, at this stage, foreclose plaintiff's nuisance claim.

18

permitted to remain open, the preliminary injunction caused greater harm to JITB than BB.[11] We disagree.

In balancing the hardships, the trial court determined legal remedies were inadequate, explaining that plaintiff had "paid contractors to remedy the mold to no avail because so long as there is continued use of the plumbing and appliances, leaks will occur on Defendants' premises and Plaintiff's premises will have mold." There is substantial evidence that plaintiff cannot remediate the mold in BB without defendants first addressing the leaking plumbing and appliances. The record reflects widespread water and sewage intrusions into BB and insufficient responses by defendants to alleviate the continued damage. This is one those "extreme cases" where the right to relief is clearly established, and irreparable injury will flow from its refusal. (*Board of Supervisors v. McMahon, supra,* 219 Cal.App.3d at pp. 295–296.)

San Francisco's COVID-related orders do not change this analysis. As it stands, BB cannot resume operations—which are currently not precluded by any COVID-related regulations or orders—until JITB satisfactorily completes the necessary repairs. The court's conclusion that defendants' continued use of the plumbing and appliances would result in plaintiff continuing to suffer irreparable harm was not an abuse of discretion, particularly when the issued injunction was limited to the inspection and approval of the required repairs.

In sum, the trial court did not abuse its discretion in concluding the balance of harms favored the issuance of a preliminary injunction.

---

[11] We grant defendants' request to take judicial notice of the relevant COVID-19 ordinances and regulations. (Evid. Code, §§ 452, 459.) In all other respects, the request for judicial notice is denied.

## DISPOSITION

The trial court's order granting the request for a preliminary injunction is affirmed.  Plaintiff is entitled to its costs on appeal.


DESAUTELS, J.*


WE CONCUR:

POLLAK, P. J.
BROWN, J.


*Chi Chi Beignet, Inc. v. Saeed Kahn et al.* (A160048)

---

* Judge of the Superior Court of California, County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.